286 N.J. Super. 89 (1995)
668 A.2d 426
STATE OF NEW JERSEY IN THE INTEREST OF J.F., JUVENILE-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 20, 1995.
Decided December 22, 1995.
*92 Before Judges HAVEY, CONLEY and BRAITHWAITE.
Susan L. Reisner, Public Defender, attorney for appellant (Cecelia Urban, Assistant Deputy Public Defender, of counsel and on the brief).
Carmen Messano, Hudson County Prosecutor, attorney for respondent, State of New Jersey (Charles Centinaro, Assistant Prosecutor, on the letter brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Following a non-jury trial, J.F. was adjudicated a delinquent based upon the trial court's determination that he had engaged in conduct that, if committed by an adult, would constitute aggravated arson, N.J.S.A. 2C:17-1a, and conspiracy to commit aggravated arson, N.J.S.A. 2C:5-2. An indeterminate term not to exceed one year at the New Jersey Training School for Boys and a two year probationary term, along with the necessary Violent Crime Compensation Board penalty, were imposed.
On appeal, J.F. contends:
POINT I.J.F.'S CONFESSION WAS INADMISSIBLE BECAUSE IT WAS NOT VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY GIVEN.
POINT II. ABSENT CORROBORATION OF J.F.'S CONFESSION, THE TRIAL COURT SHOULD HAVE ACQUITTED HIM OF BOTH CHARGES. (Not raised below).
POINT III. THE DISPOSITION IN THIS CASE WAS ILLEGAL, BECAUSE THE TRIAL COURT INCARCERATED J.F. ALTHOUGH HE IS DEVELOPMENTALLY DISABLED, AND IMPOSED AN UNAUTHORIZED SPLIT SENTENCE. (Not raised below).
1. The Juvenile Code Prohibits Incarcerating Developmentally Disabled Juveniles Such As J.F. In Correctional Facilities.
2. It Was Illegal For The Trial Court To Both Incarcerate J.F. And Place Him On Probation.

*93 POINT IV. J.F.'S ADJUDICATION OF DELINQUENCY SHOULD BE VACATED BECAUSE HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL. U.S. Const. Amends. VI, XIV; N.J. Const. (1947), Art. I, Pars. 1 and 10.
We have carefully considered these contentions. At the least, Point III raises a substantial issue as to the sentence imposed. See State in the Interest of R.M., 141 N.J. 434, 661 A.2d 1277 (1995). Our consideration, however, of Points I and II, convinces us that a reversal of the adjudications is otherwise required, rendering J.F.'s other contentions moot.
J.F. was tried with two co-juveniles who were also charged with aggravated arson and conspiracy thereof. Each juvenile had given a confession that inculpated all of the juveniles. A pretrial application by the State to jointly try the juveniles and to admit each one's confession was granted. In doing so, however, the trial judge recognized that each juvenile's confession could be considered as evidence against that juvenile only and expressly held that he would not consider a juvenile's confession as evidence of "any implication of any co-[juvenile]." Bruton v. United States, 391 U.S. 123, 135-37, 88 S.Ct. 1620, 1627-28, 20 L.Ed.2d 476, 485-86 (1968); State in the Interest of J.P.B., 143 N.J. Super. 96, 113, 362 A.2d 1183 (App.Div. 1976).
On October 12, 1993, a fire occurred in a factory located at 126 Webster Avenue, Jersey City, at approximately 11:30 a.m. Aside from the juveniles' confessions, the evidence presented by the State to establish their guilt consisted of the following. A United States Postal Carrier testified that he had seen three hispanic juveniles on the first floor of the building between 11:15 a.m. and 11:30 a.m. on the day of the fire. He did not, however, identify J.F. as one of the juveniles he saw that morning. In addition, Leo Lindo, a commercial tenant, saw three juveniles around 11:00 a.m. on the day of the fire chasing a cat into his leased space on the third and fourth floors. He identified J.F. as one of the boys he had seen that morning. Because he was afraid they would steal something, he asked them to leave and said they could give him a telephone number where he could contact them if he found the cat. *94 They did so and left. Shortly thereafter, Lindo saw smoke coming from the elevator shaft and activated the fire alarm.
Lastly, the State presented the testimony of Jersey City Arson Investigator Thomas Murphy who had investigated the cause of the fire. Investigator Murphy, however, was not identified on the State's witness list as an expert witness and he was, therefore, precluded from offering any opinion testimony as to the cause of the fire or its origin. The extent of his testimony, aside from that relating to the various confessions that he had obtained, was the following.
Upon his examination of the damage to the building, the investigator found most of the damage had occurred in an area that he described as a garbage room at the south end of the first floor. He described that room as containing a disconnected hot water heating unit, a disconnected refrigerator, and some garbage. An adjoining garbage room and a loading dock area on the first floor were also damaged, as was a room housing the elevator shaft. On the remaining floors, fire damage was observed around the elevator shaft and smoke damage was found in the attic.
As to the confession of J.F., Murphy established that between October 12 and October 20, when J.F.'s confession was taken, he had interviewed and taken statements from four other juveniles, two of whom inculpated J.F. At about 3:45 p.m. on October 20, 1993, J.F. was arrested and, with his guardian, Maria Garcia, was transported to the arson investigation headquarters at the Jersey City Fire Department. There he was questioned primarily by Investigator Jimenez, a Spanish-speaking officer. Investigator Murphy and a third investigator were also present. At 5:05 p.m., J.F. commenced a taped recorded statement which was completed at 5:31 p.m.
It appears undisputed that J.F.'s guardian, Maria Garcia, is Spanish-speaking. Thus, when the Miranda[1] rights were given *95 and a waiver thereof obtained, Investigator Murphy testified that Jimenez read the Miranda rights in Spanish. Murphy does not speak Spanish and Jimenez did not testify, thus the record does not reflect what actually was conveyed to Maria. Cf. State v. Mejia, 141 N.J. 475, 503, 662 A.2d 308 (1995) ("[t]he problem of communicating Miranda rights to non-English-speaking defendants is important, particularly in a state with so diverse a population ... the Attorney General should develop appropriate bilingual Miranda warnings. In making that recommendation, we recognize that law-enforcement cannot print Miranda warnings for all linguistic minorities. But that should not prevent the State from preparing cards for the larger segments of the non-English speaking population."). The transcript of J.F.'s statement, however, does reflect difficulty on Maria's part in understanding the warnings and the waiver thereof.[2] What is plain, moreover, is that the remainder of the interview and resulting confession was conducted by the investigator entirely in English, with the only exception at the conclusion of the statement when Jimenez asked:
Q. Okay, this concludes the statement. [J.F.] and Maria, was this a voluntary statement which means, I am talking in Spanish (Talks in Spanish).
A. Yes.
*96 Needless to say, the record is insufficient to demonstrate that J.F.'s guardian understood what it was J.F. and she were acknowledging and waiving by signing the Miranda waiver. Because, moreover, we do not know how the investigator conveyed to her the concept of voluntariness, her affirmative answer thereof is meaningless. It could as well be said that because the statement itself was obtained in a question and answer exchange between J.F. and Jimenez conducted entirely in English, Maria was unable to provide any support, assistance or guidance  at the least, the State did not demonstrate to the contrary.
Within the context of these factual circumstances, we address Points I and II in that order. In Point I, J.F. contends that his confession should not have been admitted because his guardian was effectively excluded from his custodial interrogation[3]  an assertion we conceive to be an accurate characterization of what occurred, albeit perhaps not intended by the law enforcement officials.
The Supreme Court of the United States has set the standards for conducting a proper custodial interrogation. Where the police or agents of the police seek to interrogate a juvenile, they must comply with the guidelines established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); see State in the Interest of J.P.B., supra, 143 N.J. Super. at 104-06, 362 A.2d 1183. The State bears the burden of demonstrating that waiver of the privilege against self-incrimination is made "voluntarily, *97 knowingly, and intelligently." Miranda v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.
Moreover, admissibility of a juvenile's confession, as with any criminal defendant's confession, requires proof of its voluntariness. In the case of juveniles, generally considered more susceptible than adults to psychological and other pressures, the Supreme Court of the United States has expressed the view that a higher standard of voluntariness is appropriate. Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212-13, 8 L.Ed.2d 325, 329, reh'g denied, 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed.2d 835 (1962) ("[a 14-year-old] cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights  from someone concerned with securing him those rights  and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year old boy would not be able to know, let alone assert, such constitutional rights as he had."); Haley v. Ohio, 332 U.S. 596, 599, 68 S.Ct. 302, 304, 92 L.Ed. 224, 228 (1948) (emphasizing that teen-aged juveniles "cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces.").
New Jersey courts have also espoused general principles particularly applicable to custodial interrogations of juveniles. To ensure voluntariness of a confession, interrogation should take place in the presence of the juvenile's parents or guardians, even if the juvenile waives the Miranda rights. E.g., State in the Interest of J.P.B., supra, 143 N.J. Super. at 110, 362 A.2d 1183; State in *98 the Interest of R.W., 115 N.J. Super. 286, 296, 279 A.2d 709 (App.Div. 1971), aff'd o.b., 61 N.J. 118, 293 A.2d 186 (1972) (a juvenile's statement may only be admitted if "it is conducted with the utmost fairness, without force or other improper influence, mental or physical, and in accordance with the highest standards of due process and fundamental fairness."). A juvenile must be "treated with the utmost fairness and with every consideration that his age and all of the surrounding circumstances indicate should have been accorded him. That includes having his parents present, whenever possible...." Id. at 295, 279 A.2d 709. The police may interrogate a juvenile without the parents or guardians present only if the juvenile has withheld their names and addresses, a good faith effort to locate them is unsuccessful, or they simply refuse to attend the interrogation. State in the Interest of S.H., 61 N.J. 108, 114-15, 293 A.2d 181 (1972); State in the Interest of Carlo, 48 N.J. 224, 240-41, 225 A.2d 110 (1966); State in the Interest of J.P.B., supra, 143 N.J. Super. at 96, 362 A.2d 1183; State in the Interest of A.B.M., 125 N.J. Super. 162, 168, 309 A.2d 619 (App.Div.), aff'd o.b., 63 N.J. 531, 309 A.2d 617 (1973); State in the Interest of R.W., supra, 115 N.J. Super. at 301, 279 A.2d 709. The police may not deny parents and guardians the opportunity to speak to the juvenile while in police custody. State in the Interest of S.H., supra, 61 N.J. at 114-15, 293 A.2d 181; State in the Interest of Carlo, supra, 48 N.J. at 240-41, 225 A.2d 110. Indeed, our Supreme Court has suggested that the refusal to allow a parent or guardian to be present during the interrogation of a juvenile might, alone, warrant suppression of a confession thereby obtained. Id. at 240, 225 A.2d 110. And see State in the Interest of S.H., supra, 61 N.J. at 115, 293 A.2d 181; State in the Interest of J.P.B., supra, 143 N.J. Super. at 110, 362 A.2d 1183.
In the end, however, the State must demonstrate that the totality of the circumstances establishes that the "accused's will was not overborne and that the confession was the product of a free choice." State in the Interest of S.H., supra, 61 N.J. at 114-16, 293 A.2d 181 (a juvenile's confession may be admitted even if *99 the juvenile does not understand his or her rights if the "questioning is conducted with the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.").
For instance, in Haley v. Ohio, supra, 332 U.S. at 598, 68 S.Ct. at 303, 92 L.Ed. at 227-28, the police, "in relays of one or two each," questioned a fifteen year old defendant for five hours, commencing the interrogation shortly after midnight. During the interrogation, the juvenile was alone and unaided by family, friends, or counsel. After the police showed him the alleged confessions of two other juveniles involved, the defendant signed a written confession, and was then incarcerated. The police never verbally advised defendant of his right to counsel, although the written confession sheet furnished to him included a provision discussing his constitutional rights. Moreover, while defendant was incarcerated, the police denied him contact with counsel for three days, and contact with his mother for five. These circumstances led to the Court's conclusion that the juvenile's confession was obtained in violation of due process requirements. The Court, characterizing the police's conduct as both indecent and "darkly suspicious," warned that
when, as here, a mere child  an easy victim of the law  is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race ... [W]e cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him.
[Id. at 599-600, 68 S.Ct. at 303-04, 92 L.Ed. at 228-29.]
Similarly, in State in the Interest of S.H., supra, 61 N.J. at 114, 293 A.2d 181, our Supreme Court agreed that a ten year old juvenile's inculpatory statement was "the product of police coercion," and thus violative of due process guarantees. Although the juvenile's father was at the police station when the police brought S.H. there for questioning, he left before the interrogation began because the police told him that he was not needed. Moving S.H. to an interrogation room typically used for adults, a detective administered the Miranda warnings to S.H., explaining each of them to him. After waiving his rights, S.H. was interrogated for *100 approximately ninety minutes. The Court found that the State failed to sustain its burden of proof that a voluntary confession was secured and that due process fairness considerations were satisfied, characterizing the police interrogation as exhibiting "a complete disregard for the well-being of the accused juvenile." Id. at 113, 293 A.2d 181. Although observing that "whenever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian," id. at 114-15, 293 A.2d 181, the Court declined to conclude that the police's conduct with respect to the father may, by itself, deem the elicited confession involuntary, finding other circumstances sufficient to require suppression. Id. at 115-16, 293 A.2d 181.
Here, aside from the circumstances that we have previously outlined which served to undermine any meaningful role or participation by J.F.'s guardian during his interrogation and the questionable nature of the Miranda waiver, the record contains none of the other circumstances that have compelled courts to suppress a juvenile's confession because the interrogation was not conducted "in accordance with the highest standards of due process and fundamental fairness." See State v. R.W., supra, 115 N.J. Super. at 296, 279 A.2d 709. This was not a lengthy, drawnout custodial interrogation engaged in under circumstances smacking of coercion and psychological pressures. Picked up at 3:45 p.m., J.F. gave a statement about one-and-a-half hours later at the fire headquarters. The transcript of the taped statement is not reflective of unfair procedures, aside from the failure to ensure that Maria could fully comprehend what was occurring during the interview by translating it for her into Spanish. Moreover, we also observe that although she may not have been able to comprehend the questions asked J.F. and his answers, her presence alone may have provided some source of support for J.F., as well as a form of protective buffer from overbearing police procedures. She may not have been able to understand the words, but certainly she could have observed the tone and demeanor during the *101 questioning and would, thereby, have been alerted to the possibility of oppressive or coercive tactics employed.
We are not insensitive to the role of a parent or guardian during the interrogation of a juvenile. But we are hesitant to conclude that where, as here, that role can not fully be effectuated, a juvenile's confession is per se inadmissible. Indeed, we have previously held that where parents or a guardian cannot or will not appear, "the questioning may go forward ... provided that it is conducted with the utmost fairness, without force or other improper influence, mental or physical, and in accordance with the highest standards of due process and fundamental fairness." State in the Interest of R.W., supra, 115 N.J. Super. at 296, 279 A.2d 709. See also State in the Interest of A.B.M., supra, 125 N.J. Super. at 168, 309 A.2d 619. But see State in the Interest of S.H., supra, 61 N.J. at 115, 293 A.2d 181 (suggesting that the absence of a parent, alone, may be sufficient basis for suppressing a juvenile's statement); accord State in the Interest of J.P.B., supra, 143 N.J. Super. at 110, 362 A.2d 1183.
We are convinced, however, that regardless of the admissibility of J.F.'s confession, his contention in Point II that the State failed to provide sufficient corroborative evidence requires a reversal of both adjudications. It is well established that a conviction cannot be founded solely on an uncorroborated extra-judicial confession. E.g., State v. Lucas, 30 N.J. 37, 51, 152 A.2d 50 (1959). This is, as well, true in juvenile proceedings. State in the Interest of W.J., 116 N.J. Super. 462, 465, 282 A.2d 770 (App.Div. 1971); State in the Interest of B.D., 110 N.J. Super. 585, 595, 266 A.2d 326 (App.Div. 1969), aff'd o.b., 56 N.J. 325, 266 A.2d 303 (1970).
The State must prove each element of an offense either through evidence independent of a defendant's confession or through evidence corroborating the confession. State v. DiFrisco, 118 N.J. 253, 273, 571 A.2d 914 (1990), appeal after remand, 137 N.J. 434, 645 A.2d 734 (1994). Where the State seeks to establish *102 the elements of an offense through a defendant's confession, it must produce "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury." State v. Lucas, supra, 30 N.J. at 56, 152 A.2d 50; see also State v. Ordog, 45 N.J. 347, 365, 212 A.2d 370 (1965), cert. denied, Ordog v. New Jersey, 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (1966). This requirement avoids the danger of a defendant being convicted by his own words of a crime that did not occur, or a crime committed by someone else. State v. Johnson, 31 N.J. 489, 502-03, 158 A.2d 11 (1960).
Where a juvenile's confession is involved, the State must additionally prove that the statement's "particulars were not the product of suggestion by the authorities." State in the Interest of J.P.B., supra, 143 N.J. Super. at 111-12, 362 A.2d 1183. And see State in the Interest of B.D., supra, 110 N.J. Super. at 596, 266 A.2d 326. Recognizing that different concerns exist when juveniles are involved, former Chief Justice Weintraub opined that "because of the ease with which some boys may yield to suggestion, I would insist upon a quantum of corroboration we do not now demand with respect to confessions of adults." State in the Interest of Carlo, supra, 48 N.J. at 245, 225 A.2d 110 (Weintraub, C.J., concurring). See State in the Interest of W.J., supra, 116 N.J. Super. at 471, 282 A.2d 770.
Furthermore, codefendants' confessions do not corroborate each other where one codefendant's confession implicates the other and the confessing codefendant is unavailable for cross-examination. State in the Interest of J.P.B., supra, 143 N.J. Super. at 113, 362 A.2d 1183 (citing Bruton v. United States, supra, 391 U.S. at 123, 88 S.Ct. at 1620, 20 L.Ed.2d at 476 (1968)). An accomplice's confession, then, cannot be used to corroborate the confession of another.
An example of the type of corroboration required is reflected by State v. Lucas, supra, 30 N.J. at 58-61, 152 A.2d 50. There, defendant's confession to arson was deemed adequately corroborated *103 by independent evidence confirming such details of the confession as the time of the fire, the exact room in which the fire was started, and the layout and contents of that room (including books on a mantel and chairs lined up against one wall). In addition, specific pieces of debris found in the burned room were consistent with defendant's description of how he started the fire.
Similarly, in State v. Krieger, another arson case, a confession to arson was sufficiently bolstered by the following independent evidence: evidence as to the origin of the fire that was consistent with defendant's statement; the extent of damage and the methods of cleanup were also consistent with his statement; the only things damaged were the items he specified in his confession; and there was independent evidence of his motive. 96 N.J. 256, 475 A.2d 563 (1984), rev'g on dissent 193 N.J. Super. 568, 579 (App.Div. 1983), cert. denied, Krieger v. New Jersey, 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 358 (1984). And see State v. Ordog, supra, 45 N.J. at 347, 212 A.2d 370; State v. Johnson, supra, 31 N.J. at 503-04, 158 A.2d 11.
On the other hand, in State in the Interest of W.J., supra, the only corroborative evidence of the juvenile's confession to breaking and entering was a police officer's testimony that the janitor in the building had seen W.J. in the area. However, we noted that there was no evidence at all:
corroborating any of the details in the confession, i.e., that two other persons were with the juvenile, that they broke in through the back window by pushing the wood in, that they searched a desk and took some money out, that they did not actually take away any money or liquor because they were scared off.
[116 N.J. Super. at 470, 282 A.2d 770].
Consequently, we concluded that the evidence placing the juvenile in the area of the offense was not sufficient to corroborate the trustworthiness of W.J.'s confession, and thus reversed the conviction. Id. at 471, 282 A.2d 770.
Similarly, in State in the Interest of B.D., supra, 110 N.J. Super. 585, 266 A.2d 326, we found the confessions lacked corroboration and, standing alone, were insufficient evidence of guilt. The facts showed that two victims had been stabbed to death. The only *104 proof connecting the juvenile with the killings was his confessions. Independent proofs of the State established the facts of the crime. The State argued that since these facts were similar to those contained in the confessions, the test of corroboration had been met. We rejected this argument, noting that the confessions contained practically no verified details other than the statements of having stabbed the two victims. In addition, we noted that the part of the confessions referring to one of the killings was inconsistent with the autopsy report. The juvenile said he wielded the knife in his left hand, yet the autopsy report indicated that the knifing was done by a right-handed person. Finally, we noted that many of the facts of the crime had been told to the juvenile by the officers before his confessions.
As these cases illustrate, while the details provided in a confession of an offense are important and may be sufficient to establish the necessary corroboration, that is so where there exists no rational explanation of how a defendant could have learned of those details other than by having been involved in the offense. On the other hand, where there is a rational explanation of how the defendant could have learned about the facts of the crime, "no real inference of trustworthiness can properly be drawn from any consistency shown." State in the Interest of B.D., supra, 110 N.J. Super. at 596, 266 A.2d 326. Compare State v. Ordog, supra, 45 N.J. at 364, 212 A.2d 370 (critical facts of crime could only be known to a participant, absent any explanation of how the defendant would know these corroborative facts except by his own participation in the crime); State v. Lucas, 30 N.J. at 61, 152 A.2d 50 (corroboration established where the record did not reveal any "evidence tending to explain, consistent with the hypothesis of innocence, how ... defendant acquired the incriminating information" included in his statement).
Here, J.F.'s confession did not contain a great many details aside from the time of the fire (which was not necessarily accurate), the location of the building, and the description of the "basement room" in which he said he lit a match to some plastic. *105 These details easily could have been learned from the other juveniles involved, each of whom had given inculpatory and detailed statements prior to J.F.'s confession. Moreover, some of the details in his confession are not consistent with the other evidence. The tenant, on the one hand, asserted that J.F. was one of the juveniles who had chased a cat into his premises shortly before the fire started. According to J.F.'s statement, on the other hand, he was not in the building prior to setting the fire; rather, he said that one of the other juveniles had told him that they were there earlier looking for a cat. Further, Investigator Murphy observed the most damage in a garbage room located on the first floor that contained a disconnected hot water heater, refrigerator, and some garbage. J.F. stated that the fire was started in a basement room reached by walking downstairs from the front door. The room that J.F. described contained wood, some bags, and some cartons of clothes; he did not mention a hot water heater or refrigerator. Finally, unlike Lucas and Krieger, there was no evidence found that was consistent with J.F.'s description of how the fire was started.
The State concedes that there exists no corroborative evidence of the conspiracy charge. See State v. Abrams, 256 N.J. Super. 390, 402, 607 A.2d 179 (App.Div.), certif. denied, 130 N.J. 395, 614 A.2d 617 (1992). The only corroborative evidence as to aggravated arson consists of the tenant's identification of J.F. as one of the boys present in the building shortly before the fire, and Investigator Murphy's testimony that most of the damage occurred in the basement room. J.F.'s earlier presence in the building, however, alone is not sufficient corroboration of the trustworthiness of his confession to aggravated arson. Moreover, the postal official, who saw several juveniles on the premises before the fire, could not identify J.F. as one of them. And Murphy's testimony not only failed to establish that the garbage room he described was the origin of the fire, but also that that room and J.F.'s basement room are necessarily the same. Under these circumstances, we are compelled to conclude that the State failed to establish "independent proof of facts and circumstances which strengthen or *106 bolster the confession and tend to generate a belief in its trustworthiness...." State v. Lucas, supra, 30 N.J. at 56, 152 A.2d 50.
Accordingly, we reverse and remand for the vacation of the adjudication of delinquency and sentence imposed thereon.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] After the waiver portion of the warnings was read to both J.F. and Maria, apparently in English, each was asked if they understood. The following then occurred:

Q. Maria, [J.F.]  do you understand?
A. (Inaudible)
Q. Okay. Do you want me to explain it to you?
A. Yes.
Q. Okay. I am going to explain it to you and you have a choice of either to sign or not to sign. What this means is that I have read the statement of my rights  (speaking Spanish) Okay.
A. (Answers in Spanish)
Q. (Speaking Spanish) I am now interpreting the section of the Waiver in Spanish to Maria Garcia. (Speaking Spanish) Okay? I'm going to sign the Waiver Section and I am going to ask Maria Garcia if she understood the Waiver Section. Did you understand the Waiver Section? Is there anything else for me to explain?
A. Yes.
[3] J.F.'s presentence report reflects that he has been classified by school officials as "perceptually impaired." See generally N.J.A.C. 6:28-3.5(d)(8)(ii). He contends that as a result of such impairment, the voluntariness of his confession is further suspect. Beyond, however, the reference in the presentence report, the record is silent as to the basis for such classification or the nature and extent of the impairment. It provides no basis, therefore, for consideration of the effect of whatever may be his impairment upon the admissibility of his confession. For this, J.F. contends that trial counsel was ineffective. We reach our determination here without consideration of J.F.'s impairment, to whatever extent it may be. We, therefore, express no view on his claim of ineffective assistance of counsel.