765 A.2d 1084 (2001)
336 N.J. Super. 614
STATE in the Interest of J.D.H.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 2000.
Decided January 29, 2001.
*1086 Daniel J. Cohen, Morristown, argued the cause for appellant J.D.H. (McElroy, Deutsch & Mulvaney, attorneys; Mr. Cohen, of counsel and, with Joseph J. McGlone and Timothy P. Smith, on the brief).
LeeAnn Cunningham, Assistant Prosecutor, argued the cause for respondent State of New Jersey (John G. Laky, Warren County Prosecutor, attorney; Laura M. Lynch, Assistant Prosecutor, of counsel and on the brief).
Before Judges PRESSLER, KESTIN and CIANCIA.
*1085 The opinion of the court was delivered by KESTIN, J.A.D.
J.D.H., a sixteen-year-old juvenile at the time of the events at issue, was charged with acts of delinquency which, if committed by an adult, would have constituted aggravated sexual assault (first degree), sexual assault (second degree), aggravated criminal sexual contact (third degree), and criminal sexual contact (fourth degree). Additional charges sounding in fourth degree contempt and petty disorderly persons were also lodged.
After a trial on three days in September 1998, the judge found that the juvenile had committed the sexual offenses alleged but that the remaining charges had not been proven. The judge's findings and reasoning were expressed in a letter opinion dated September 29, 1998. A judgment was entered on October 29, 1998, formally adjudicating delinquency on the sustained charges. Thereafter, the juvenile moved for reconsideration. That motion was denied on January 9, 1999.
Disposition of the matter occurred on June 30, 1999, after appropriate reports and evaluations had been received. The juvenile was committed to concurrent indeterminate terms not to exceed one year at the Training School for Boys at Jamesburg, see N.J.S.A. 2A:4A-44d, with a provision that he avail himself of treatment for sex offenders while there. Four months post-incarceration supervision was also ordered along with sex offender registration pursuant to N.J.S.A. 2C:7-2 upon release.
On July 2, 1999, the trial judge denied the juvenile's motion for a stay of the disposition pending appeal. On July 15, we denied an emergent application for the same relief. On August 11, the Supreme Court granted the stay of commitment pending appeal, "subject to those conditions deemed appropriate by the trial court." On August 24, another judge in *1087 the trial court entered an order reciting the terms governing the juvenile's release from commitment pending appeal:
1. J.H. is to have no contact with the victim or the victim's family, either directly, indirectly, or through third parties;
2. J.H. may attend Morris County Community College ("college"). If J.H. attends Morris County Community College, he must provide the Warren County Probation Department ("Probation") with verification of his enrollment. J.H. must also notify Probation if he terminates his enrollment from the college by virtue of graduation or otherwise;
3. J.H. is permitted to be employed by his parents' business, North American Fire Protection. J.H. shall provide Probation with verification of his work schedule at the conclusion of each work week;
4. J.H. may operate a motor vehicle alone: (1) to travel to and from work; (2) during the course of his employment; (3) to travel to and from classes at Morris County Community College; and (4) to travel to and from the Warren County Probation Department;
5. J.H. is not to possess or use alcohol or drugs;
6. J.H. is to report weekly to the Warren County Probation Department and provide weekly urine samples for testing by the Warren County Probation Department. That supervision by the Warren County Probation Department is ordered as an express condition of J.H.'s release pending appeal, and shall continue until the disposition of his appeal or up to J.H.'s 21st birthday, whichever occurs first;
7. J.H. may not leave Warren County unless: (1) he is in the presence of his parents; (2) he is attending classes at Morris County Community College; (3) it is in the course of his employment;
8. J.H. may not attend any social events outside his home unless he is in the presence of his parents;
9. J.H. is permitted to go anywhere outside Warren County so long as he is in the presence of his parents.
The juvenile's notice of appeal expresses challenges to the June 30, 1999 order of disposition, which restated the adjudication of delinquency; and to the July 2 order of commitment. The issues raised on appeal bear upon the trial judge's ruling admitting statements the juvenile made in an intercepted telephone conversation. They are:
I. THE POLICE-LED INTERROGATION OF AN UNWITTING JUVENILE SUSPECT VIOLATED THE FUNDAMENTAL FAIRNESS REQUIREMENT OF THAT JUVENILE'S DUE-PROCESS RIGHTS.
II. THE USE OF A CONSENSUAL INTERCEPTION TO INVESTIGATE AN ALLEGED ACT OF DELINQUENCY WAS NOT AUTHORIZED BY THE NEW JERSEY WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, N.J.S.A. 2A:156A-1 TO -34, AS IT EXISTED AT THE TIME OF THE SUBJECT ACT OF DELINQUENCY.
We regard the first issue to have considerable merit.
The victim, also sixteen years old, testified at trial. She and J.D.H. attended a party on Saturday, April 4, 1998. The victim became very drunk and sick. Fearing her parents' reaction, she did not want to go home. Her boyfriend and J.D.H. agreed she would stay the night at J.D.H.'s home. The victim testified that beginning shortly after they arrived at the home, J.D.H. committed a series of sexually assaultive acts on her. She described the encounter in substantial detail and testified *1088 that although she was fully aware of J.D.H.'s efforts and attempted to counteract them, she was too ill and weak to resist effectively.
The victim did not attend school the following Monday and Tuesday because, she testified, she did not want to see J.D.H. On Tuesday evening, she recounted the events to her mother. The matter was reported to the police.
On Wednesday, April 8, 1998, the victim and her mother met with Detective Toni Latario of the Warren County Prosecutor's Office Sexual Assault/Child Abuse Unit. As a result of their conversation, Latario requested and received from the Prosecutor, pursuant to N.J.S.A. 2A:156A-4c, authorization for a "consensual telephone interception."
On Thursday, April 9, the victim placed a telephone call from State Police Hope Barracks to J.D.H. in Latario's presence. According to Latario, she was
listen[ing] to what was being said and the device was hooked up to the phone and, if she got stuck, I would write down what I thought appropriate for her to ask; not any leading type of statements. That's not what I wanted here. I just wanted the truth to be made known.
The conversation was recorded and transcribed. In it, with questioning prompted by Latario, the victim was able to get J.D.H. to acknowledge every important factual element of her allegations concerning his conduct during their encounter. Latario testified: "if you listen to the tape and you hear the questions and what she's saying, what she's saying is what I was writing, basically[,]" but Latario denied coaching every question the victim asked.
Over objection by J.D.H.'s attorney, the audiotape of the telephone conversation was played for the court during Latario's testimony and the transcription was also provided. At the close of its case, the State moved the tape alone into evidence. Stressing Detective Latario's admission that she had directed the conversation, the defense objected again, on the basis that the tape was the product of "an interrogation by an officer of the law of a juvenile... without previous parental consent, ... let alone the parameters of the Constitution and warnings prior to any admission and any questions concerning where [sic] they had `probabl[e] cause' to conduct this in the first instance." The State argued in response that a custodial interrogation had not occurred. "The victim is the one asking the questions[ ]" and the detective was "giv[ing] the victim some kind of guidance." The State also argued that the requirements of statute for a "consensual intercept" had been met. The trial judge suggested during her colloquy with counsel: "So the victim ... heeded the advice and the suggestion of the detective [and] read the questions from the detective's notes. I don't see what's wrong with that." The judge also expressed the view that the subsequent denial by J.D.H.'s parents of a police request to interview him had no bearing on the tape's admissibility.
When trial resumed twelve days later, the judge ruled formally that the tape would be received in evidence: "[I]nasmuch as [the telephone conversation] was not a custodial interrogation, [the defense] argument has to fail." The judge opined that in order for the parental notification argument to apply, the juvenile would have to have been in custody. She held: "The juvenile was not in custody. He was speaking voluntarily to the victim and therefore there was no violation of his constitutional rights as indicated by the statute in [sic] the case law in our State." Later in the proceeding, after hearing counsel's arguments on the juvenile's motion for a judgment of acquittal, the trial judge denied the motion "without even taking into consideration what I heard on the tape, just on [the victim's] testimony alone."
The defense case was then presented. J.D.H. testified. He corroborated the victim's description of the details of his conduct, but denied using any force. In *1089 cross-examination, he asserted his belief that the victim consented to his conduct, but acknowledged that that consent had not been verbally expressed at any time during the encounter. He acknowledged further that the victim had acted as she said she did to repel his advances.
In her letter opinion disposing of the matter, the judge reviewed the evidence, recounting in detail the contents of the audiotape and J.D.H.'s admissions in the telephone conversation. In contradistinction to her disavowed use of the telephone conversation in disposing earlier of the juvenile's motion for a judgment of acquittal, the trial judge, in finally adjudicating the matter, juxtaposed specific features of the telephone conversation with J.D.H.'s testimony at trial, focusing on consistencies or inconsistencies between the two.
The trial judge "found the victim to be credible[,]" and that "her recollection of events was corroborated by her boyfriend..., her mother and her friend.... Her version of events was also consistent with what the juvenile stated during the taped telephone conversation ... once the juvenile stopped denying that he had done anything of a sexual nature to her on the night in question." In her findings, the judge stressed the inconsistencies between the telephone conversation and J.D.H.'s testimony at trial and noted "the juvenile has essentially three different versions of what occurred that evening, making his testimony entirely unreliable[ ]" and "that at no point during the telephone conversation did the juvenile state or imply that he believed the encounter was consensual." She concluded:
The juvenile took advantage of the victim, even though it should have been apparent to the reasonable person that she was physically helpless, not to mention that she expressly told the juvenile to stop what he was doing to her sexually. Even if the victim's protests had not been especially vociferous, it should have been apparent to the juvenile that the victim may have been incapable of expressing more demonstrably her unwillingness to participate in the sexual encounter. The Court does not accept the juvenile's version of events, which spanned from outright denial to evasiveness and coyness, to an admission that there was sexual contact with the victim, to his trial testimony, the essence of which was there was sexual contact but that the contact was consensual. Not only is the juvenile's testimony not credible, but also there is every indication, given his statements during the telephone conversation and at trial, that he knew he had engaged in wrongdoing and was grasping to come up with a believable story.
The trial court's ruling admitting the audiotape into evidence was erroneous. With Detective Latario's participation in the telephone communication between the victim and J.D.H., as the detective herself recounted it, that "conversation" became a police interrogation. The fact that the police officer chose to use the victim as an interlocutor did not change the essential dynamic of the situation. J.D.H. was being questioned by Detective Latario, and the interrogation was accomplished without parental consent or involvement.
Recently, in State v. Presha, 163 N.J. 304, 748 A.2d 1108 (2000), the Supreme Court clarified the guidelines governing police interrogation of juveniles. The focal issue in that case was "the voluntariness of a confession by defendant, a juvenile, in a custodial setting." Id. at 307, 748 A.2d 1108; see also In re Carlo, 48 N.J. 224, 225 A.2d 110 (1966). Although the instant matter does not involve a custodial interrogation, Presha and the cases it relies upon are instructive for their reflections on underlying policies governing all interrogations of juveniles.
Typically, the cases that deal with the admissibility of juveniles' statements arise in the context of a court's need to rule upon the voluntariness of an inculpatory declaration, usually in the form of a *1090 confession obtained after the juvenile, at least formally, has been given the customary Miranda[*] warnings. See In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). As the trial judge correctly observed, there was no custodial interrogation here. However, the inquiry does not end with that fact, as the trial judge perceived it did. It is always required that
for a confession to be admissible as evidence, prosecutors must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances. [citations omitted]
At the root of the inquiry is whether a suspect's will has been overborne by police conduct. * * *
The requirement of voluntariness applies equally to adult and juvenile confessions. [citations omitted]
The role of a parent in the context of a juvenile interrogation takes on special significance. In that circumstance, the parent serves as advisor to the juvenile, someone who can offer a measure of support in the unfamiliar setting of the police station. Thus, we have emphasized that "[w]henever possible and especially in the case of young children no child should be interviewed except in the presence of his parents or guardian." In re S.H., 61 N.J. 108, 114-15, 293 A.2d 181 (1972). [other citations omitted]
[Presha, supra, 163 N.J. at 313-14, 748 A.2d 1108.]
Although this discussion contains a reference to station house interrogation, we take the protection discussed to apply more broadly given the special susceptibility of minors to having their wills overborne when questioned by adults. See In re J.F., 286 N.J.Super. 89, 97, 668 A.2d 426 (App.Div.1995).
With the State's increased focus on the apprehension and prosecution of youthful offenders, the parent's role in an interrogation setting takes on new significance. When younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation. Gallegos [v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212-13, 8 L.Ed.2d 325, 329 (1962)].
In view of the changing realities of the juvenile process and the important rights at stake, we reaffirm our belief that a parent or legal guardian should be present in the interrogation room, whenever possible. In re S.H., supra, 61 N.J. 108, 293 A.2d 181. In respect of confessions by juveniles of any age, courts should consider the adult's absence as a highly significant factor among all other facts and circumstances. By "highly significant factor" we mean that courts should give that factor added weight when balancing it against all other factors. By elevating the significance of the adult's role in the overall balance, we are satisfied that the rights of juveniles will be protected in a manner consistent with constitutional guarantees and modern realities.

* * * *
Regardless of the juvenile's age, police officers must use their best efforts to locate a parent or legal guardian before beginning the interrogation. In re J.F., 286 N.J.Super. 89, 98, 668 A.2d 426 (App.Div.1995). Moreover, to sustain the admissibility of incriminating statements made outside of the adult's presence, prosecutors are required to show to the trial court's satisfaction, upon sufficient proofs, that they were unable to locate the adult. * * *
*1091 As important, when an adult is unavailable or declines to accompany the juvenile, the police must conduct the interrogation with "the utmost fairness and in accordance with the highest standards of due process and fundamental fairness." In re S.H., supra, 61 N.J. at 115, 293 A.2d 181; State v. R.W., [115 N.J.Super. 286, 296, 279 A.2d 709 (App. Div.1971)]. That requirement, too, has been a common thread in our jurisprudence and is reaffirmed today.
[Presha, supra, 163 N.J. at 314-17, 748 A.2d 1108.]
These protections regarding parental involvement must be taken to apply literally and broadly to every juvenile who is the focus of a police investigation irrespective of where the questioning occurs or how it is accomplished. See In re J.F., supra, 286 N.J.Super. at 97-101, 668 A.2d 426. They are, for particular reasons having to do with the special interests and susceptibilities of juveniles, a functional equivalent of the protections afforded any suspect by the Miranda rule. Although different and separate from the Miranda protections, especially since a custodial setting is not a prerequisite, parental involvement is required for the same reasons: to provide assurances that inculpatory statements elicited in police interrogations are the product of informed and voluntary choices and to minimize the risk that the will of a juvenile, to whom our jurisprudence has traditionally afforded special protection, has been overborne.
Thus, the precise issue before us is only circumstantially informed by the fact that the conversation at issue occurred telephonically and not physically at police headquarters or otherwise in custody-like circumstances. The focal question is whether a police interrogation occurred and how the involvement of an intermediary affects that determination.
It is well established that, although Miranda principles generally do not apply to confessions elicited by private individuals, "when government officials participate in those actions, the actions of the private individual may come under scrutiny...." People v. Lewis, 273 A.D.2d 254, 709 N.Y.S.2d 572, 573 (2000); see also State v. Biancamano, 284 N.J.Super. 654, 663, 666 A.2d 199 (App.Div.1995) ("The Miranda rule does not apply to a private citizen ... who is acting neither as an instrument of the police nor as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile.") (quoting Commonwealth v. Snyder, 413 Mass. 521, 597 N.E.2d 1363, 1369 (1992)); United States v. Webb, 755 F.2d 382, 391 (5th Cir.1985) ("Confessions to private individuals are not barred by Miranda absent government participation."); In re McCluskey, 59 Or.App. 575, 652 P.2d 812, 814 (1982) ("[T]he involvement and intent of a private individual are relevant only insofar as they are initiated, planned, controlled or supported by the police.").
It is clear from these cases and others of like purport that the mere involvement of an intermediary does not serve to mitigate the police conduct or transmute a police interrogation into something else. The participation of the intermediary is not the critical factor; rather, the extent to which the police controlled the inquiry will determine whether a conversation became an interrogation.
This is especially so in a case of this type because the will of a juvenile is especially susceptible to being overborne by suggestions or artifice which might have a lesser effect upon an adult. In re J.F., supra, 286 N.J.Super. at 97, 668 A.2d 426. Where, as here, a police officer directed the exploration by suggesting both the lines of inquiry and specific questions to be asked, we can reach no conclusion other than that the telephone conversation in this matter was a police interrogation. Because it was conducted with a juvenile who was the target of the police investigation, and was undertaken without parental notification, it breached the well-established policies of this State designed to *1092 protect juveniles from having their wills overborne and was inadmissible at trial for the same reasons that would exclude a custodial interrogation of any suspect conducted without Miranda warnings.
Having reached this conclusion, it is not essential that we decide whether consensual interceptions of a juvenile's conversations are a permissible investigative tool. We are constrained to observe, however, that there is no general legal bar or policy reason limiting the availability of any police investigative techniques authorized by law in probing allegations of juvenile delinquency. It is the circumstances which might lead to a preclusion, not the investigative method used. Where the use of a practice comes into conflict with specific, basic protections specially afforded juveniles it may be regarded as impermissible. Here, it is not the use of a consensual interception of a telephone conversation that provides the taint, but rather the circumstances of using the juvenile victim as a surrogate to proffer the questions framed by the police without affording the juvenile suspect the protection of parental involvement. The police may not use a third party to validate a procedure that would be impermissible if conducted directly.
Manifestly, because the trial judge's findings and conclusions regarding the juvenile's culpability on the charges lodged are based on inadmissible evidence, they cannot stand. Even though the judge, in ruling on the juvenile's motion for a judgment of acquittal after the State had rested its case, stated that the motion was denied "without even taking into consideration what I heard on the tape, just on [the victim's] testimony alone[,]" her findings at the close of the case were so dependent upon the juvenile's taped statement and his testimony offered to mitigate its effects after the audiotape was admitted in evidence, that they were invalid bases for her delinquency determinations on the offenses charged.
Were it not for the fact that the outcome of this case, even under the most error-free circumstances, was entirely dependent upon determinations of credibilitythe victim's, if not also J.D.H.'swe might adopt the course of action chosen by the Supreme Court in S.H. to dispose of this matter. There, the Court observed:
A new trial, however, is not necessary. A juvenile hearing is not a criminal case; it is a civil proceeding, tried without a jury, and conducted in the interest of the juvenile and for the welfare of society. State v. Tuddles, 38 N.J. 565, 571-572, 186 A.2d 284 (1962). In such a case our Constitution and rules permit us to exercise such original jurisdiction as may be necessary to the complete determination of the cause on review. N.J. Const., Art. 6, Sec. 5, para. 3; R. 2:10-5; see State v. Taylor, 38 N.J.Super. 6, 21, 118 A.2d 36 (1955). In exercising that jurisdiction we have examined the undisputed evidence other than that contained in the inadmissible confession and find therefrom beyond a reasonable doubt that [the juvenile] committed the act set forth in the charge and that he therefore requires rehabilitative treatment.
[In re S.H., 61 N.J. 108, 116, 293 A.2d 181 (1972).]
The ultimate determination in S.H., however, was not as fully impacted by credibility considerations as is the resolution of the charges in this matter.
We might, too, examine the record with care. We might disregard entirely the juvenile's audiotaped statement and his testimony at trial, and consider only the direct testimony of the victim along with the circumstantial corroboration provided by her boyfriend, her mother, and a female friend. We might regard that testimony as compelling evidence that the juvenile committed the acts charged and that nothing the victim said or did at the time may be taken to have signified her consent to J.D.H.'s sexually assaultive conduct. Yet, all this would be done on a cold record *1093 without the benefit of such insights as live testimony would furnish. Our original jurisdiction, see N.J. Const., art. VI, § 5, ¶ 3; R. 2:10-5, is not meant to be exercised in cases so dependent upon credibility assessments as this one is. Our evaluation of the record as trial judges, reviewing only the admissible evidence in this non-jury matter, would be a sterile exercise; and any finding beyond a reasonable doubt that J.D.H. committed the acts charged, which, if committed by an adult, would have constituted aggravated sexual assault, sexual assault, aggravated criminal sexual contact, and criminal sexual contact, while possibly satisfying requirements of form, would have little actual substance.
The matter must, therefore, be remanded for retrial. For kindred reasons bearing upon the apparent and actual integrity of credibility determinations, when the matter is retried using admissible evidence alone, it should be heard by a different judge than presided over the initial trial.
Even if an affirmance had been possible, given the fact that a year-and-a-half has passed since the trial court's disposition was framed, we would remand for reconsideration of each element thereof. Much has occurred in the interim, including the fact that J.D.H., since August 24, 1999, has been governed by the strictures and exacting conditions established by the trial court in implementing the stay ordered by the Supreme Court. It may well be that those requirements alone have had as much of a rehabilitative effect as any term of incarceration might in aiding the juvenile to appreciate the wrong alleged, to contemplate its effects on others, and to resolve, with understanding, never to repeat such a course of conduct as he may have undertaken in the circumstances depicted.
Even with the relatively recent accentuation of punishment as a component of the juvenile justice system, constructive approaches to rehabilitation remain as a primary aim. See Presha, supra, 163 N.J. at 314, 748 A.2d 1108. Neither those rehabilitative ends nor any decent punitive requirements would be served by applying stale perceptions in the process of crafting a juvenile disposition that makes sense. Even if nothing else significant had occurred in the interim, the year-and-a-half which has passed since the initial disposition by itself would suggest the need for fresh evaluation and a new disposition. Of course, should the charges be sustained after the retrial we have ordered, a new disposition would perforce be required after updated evaluations are conducted and in the light of the trial court's determinations concerning legal requirements and the best interests of all concerned.
The adjudications of delinquency are reversed. The matter is remanded for retrial.
NOTES
[*] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).