795 A.2d 851 (2002)
171 N.J. 475
STATE of New Jersey in the Interest of J.D.H., IV, a Juvenile.
Supreme Court of New Jersey.
Argued January 3, 2002.
Decided May 1, 2002.
*852 LeeAnn Cunningham, Assistant Prosecutor, argued the cause for appellant and cross-respondent, State of New Jersey (John G. Laky, Warren County Prosecutor, attorney).
Daniel J. Cohen, Morristown, argued the cause for respondent and cross-appellant, J.D.H., IV (McElroy, Deutsch & Mulvaney, attorneys; Mr. Cohen and Timothy P. Smith, on the briefs).
Deborah C. Bartolomey, Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (John J. Farmer, Jr., Attorney General, attorney).
The opinion of the Court was delivered by VERNIERO, J.
We are called on to determine the admissibility of a taped telephone conversation between J.D.H. and the victim of his sexual assault during which J.D.H. incriminated himself. The trial court admitted the conversation. Citing our decision in State v. Presha, 163 N.J. 304, 748 A.2d 1108 (2000), in which we addressed the standards to be used when evaluating statements made by juveniles in police custody, the Appellate Division held that J.D.H.'s statements were inadmissible. We disagree and reverse.

I.
These are the pertinent facts, derived largely from testimony at J.D.H.'s trial. In April 1998, J.D.H., a juvenile, and C.D., also a juvenile, attended a party at which C.D. became intoxicated. C.D.'s boyfriend, who also attended the party, entrusted J.D.H. to bring C.D. to J.D.H.'s house for the night so that C.D. could "sleep it off" before returning to her own home.
*853 J.D.H. brought C.D. to his parents' home where he also lived. There, he escorted her to his bedroom and helped her into his bed. J.D.H. then left the room. A brief time later, J.D.H. reentered the bedroom and joined C.D. in bed. He proceeded to touch and kiss C.D.'s breasts, digitally penetrate her vagina, and forcefully hold her hand on his penis until he ejaculated. C.D. testified that she told J.D.H. many times to cease his conduct and that she turned her body away from his to get him to stop. She stated that she was too weak and confused to take more assertive action. She also indicated that J.D.H. told her during the incident that her boyfriend "said it was okay," and that he was "doing this for [her boyfriend]."
A few days later C.D. told her mother what had happened, and they contacted law enforcement authorities. The New Jersey State Police referred the matter to the Warren County Prosecutor's Office. After obtaining statements from C.D. and her mother, a detective from the prosecutor's office made arrangements to intercept a conversation between C.D. and J.D.H. Specifically, the detective obtained authorization from the county prosecutor to tape record a telephone conversation between C.D. and J.D.H. pursuant to the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -34 (Wiretap Act or Act). C.D. and her mother consented to the interception by executing a written consent form.
In accordance with those arrangements, C.D. placed a telephone call to J.D.H. at his home that, unbeknownst to him, was being recorded at a State Police barracks in Warren County. Officials positioned the telephone so that the detective from the prosecutor's office could listen to the conversation and assist C.D. in formulating appropriate questions to ask of J.D.H. J.D.H. was sixteen years old at the time of the conversation.
The detective explained her involvement:
Basically, I listen[ed] to what was being said and the device was hooked up to the phone and, if [C.D.] got stuck, I would write down what I thought appropriate for her to ask; not any leading type of statements. That's not what I wanted here. I just wanted the truth to be made known.
The detective further stated, "if you listen to the tape and you hear the questions and what [C.D.'s] saying, what she's saying is what I was writing, basically." The detective could not identify more precisely the questions that she had suggested.
J.D.H. incriminated himself during the taped conversation. When asked by C.D. what happened on the night in question, J.D.H. first gave an innocent account of events. C.D. responded by saying that she never had fallen asleep that night, that she knew what had happened, and that she wanted J.D.H. to apologize for his actions. J.D.H. said that he would admit to "whatever" because he just wanted the "whole thing" to be resolved. After J.D.H. indicated that he would admit to "making [C.D.] jerk [him] off and having to undress [her]," C.D. asked why he had acted in that fashion. J.D.H. responded, "I don't know why I did it."
J.D.H. also stated, "I'm sorry if I [took advantage of you]. I'm sorry, I will do anything to make it up to you, anything. What do you want?" Essentially, C.D. kept asking J.D.H. to admit to what he had done. She also told him that she remembered the events of the evening, and that she needed to hear him admit the truth as part of a healing process. Toward the end of the conversation J.D.H. stated: "I don't know what came over me, I really don't. I've never done anything *854 like this before in my life, I would never do it again. People know me better than that. I thought I knew myself better than that. Ever since then I haven't been able to sleep."
In September 1998, J.D.H. was tried for acts that, if committed by an adult, would have constituted aggravated sexual assault. The trial court admitted the taped conversation over J.D.H.'s objections. The court determined that J.D.H. was not in police custody during the conversation and that he spoke voluntarily to C.D., consistent with applicable legal standards. The court concluded that the case law requiring that the police notify a parent or legal guardian before an interrogation of a juvenile did not apply to the noncustodial questioning that occurred here.
Following a three-day trial, the trial court adjudicated J.D.H. delinquent for commission of aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(7); sexual assault by physical force, in violation of N.J.S.A. 2C:14-2c(1); aggravated criminal sexual contact, in violation of N.J.S.A. 2C:14-3a; and criminal sexual contact, in violation of N.J.S.A. 2C:14-3b. The court committed J.D.H. to twelve months at the New Jersey Training School for Boys in Jamesburg and ordered him to avail himself of sex-offender therapy.
This Court stayed J.D.H.'s commitment pending appeal, subject to conditions imposed by the trial court. In a reported decision, the Appellate Division reversed the adjudication of delinquency and remanded for a new trial. In the Interest of J.D.H., 336 N.J.Super. 614, 765 A.2d 1084 (2001). The panel held that the trial court erred in admitting J.D.H.'s incriminating statements obtained during the conversation intercepted by the police in the absence of "parental consent or involvement." Id. at 623, 765 A.2d 1084. In view of that disposition, the Appellate Division did not reach J.D.H.'s alternative argument that, as written, the Wiretap Act prohibited the use of consensual interceptions in delinquency investigations. Id. at 626, 765 A.2d 1084.
We granted both the State's petition for certification to consider the admissibility of J.D.H.'s statements, and J.D.H.'s cross petition to determine whether the State's conduct violated the Wiretap Act. 168 N.J. 291, 773 A.2d 1155 (2001). We also granted amicus status to the Attorney General.

II.
The Appellate Division concluded correctly that J.D.H.'s incriminatory statements were not the product of a custodial interrogation. J.D.H., supra, 336 N.J.Super. at 623, 765 A.2d 1084. We recently explained "that `[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, and the status of the suspect[.]'" State v. Stott, 171 N.J. 343, 365, 794 A.2d 120, 133 (2002) (quoting State v. P.Z., 152 N.J. 86, 103, 703 A.2d 901 (1997)). We also have indicated that "[a]nother factor is whether a suspect knew that he or she was a focus of the police investigation." Id. at 365, 794 A.2d 133.
We are satisfied that the record before us contains none of the indicia of custody. C.D. placed the telephone call to J.D.H.'s home, and J.D.H. was free to terminate the conversation at any time. Similarly, no one deprived J.D.H. of his freedom of action. From J.D.H.'s perspective, there were no objective indications that he was a suspect or being singled out for questioning by the police. As far as J.D.H. was concerned, he merely was conversing with C.D. on the telephone in the familiar surroundings of his own home. Under those circumstances, J.D.H. was not in custody *855 for purposes of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
We part company from the Appellate Division in its application of Presha to a non-custodial context. In Presha, supra, we considered "the voluntariness of a confession by defendant, a juvenile, in a custodial setting." 163 N.J. at 307, 748 A.2d 1108. The defendant had confessed to "committing certain offenses after waiving his constitutional rights in the presence of his mother and deciding that he did not want her present in the interrogation room." Id. at 307-08, 748 A.2d 1108. We held "that courts should consider the totality of circumstances when reviewing the admissibility of confessions by juveniles in custody." Id. at 308, 748 A.2d 1108. Under that standard, the Court was satisfied that the defendant's will "was not overborne by investigators, the critical factor in [the] inquiry." Id. at 318, 748 A.2d 1108.
Although J.D.H. was sixteen at the time of his taped statements, we note for completeness that the Presha Court also determined that "a special circumstance exists when a juvenile is under the age of fourteen." Id. at 308, 748 A.2d 1108. In that situation, an "adult's absence [from the interrogation area] will render the young offender's statement inadmissible as a matter of law, unless the parent or legal guardian is truly unavailable." Ibid. We stressed that, "[r]egardless of the juvenile's age, law enforcement officers must use their best efforts to locate the adult before beginning the interrogation and should account for those efforts to the trial court's satisfaction." Ibid.
The requirements articulated in Presha, therefore, are triggered when a juvenile is in police custody facing an interrogation. The Court in that case explained its rationale, in part, as follows:
With the State's increased focus on the apprehension and prosecution of youthful offenders, the parent's role in an interrogation setting takes on new significance. When younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
[Id. at 314-15, 748 A.2d 1108 (citing Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212-13, 8 L.Ed.2d 325, 329 (1962)).]
Here, as noted, J.D.H. was in the familiar surroundings of his own home, entirely unaware of the detective's involvement, when he spoke to C.D. on the telephone. We are persuaded that the type of pressure inherent in a custodial interrogation, the focus of our concern in Presha, did not exist in the non-custodial setting here. Accordingly, extending the Presha holding to these circumstances is not warranted. In the absence of any other reason to doubt the voluntariness of J.D.H.'s statements, we hold that the trial court did not err in admitting them into evidence at trial.

III.
We next address J.D.H.'s contention in respect of the Wiretap Act. When the taped conversation occurred, the statute provided, in relevant part:
It shall not be unlawful under this act for:
....
c. Any person acting at the direction of an investigative or law enforcement officer to intercept a wire, electronic or oral communication, where such person is a *856 party to the communication or one of the parties to the communication has given prior consent to such interception; provided, however, that no such interception shall be made unless the Attorney General or his designee or a county prosecutor within his authority determines that there exists a reasonable suspicion that evidence of criminal conduct will be derived from such interception[.]
[N.J.S.A. 2A:156A-4 (1993) (emphasis added), amended by L. 1999, c. 151 § 3.]
In a nutshell, J.D.H. contends that the Wiretap Act's use of the phrase "criminal conduct" was meant to exclude the police from intercepting communications of juvenile suspects. J.D.H. argues that he did not engage in criminal conduct for purposes of the Act because, as a juvenile, he could be adjudicated only for acts of "delinquency" but could not be prosecuted for adult "crimes." Although the Appellate Division did not reach that issue in view of its disposition, it stated in dicta: "We are constrained to observe [ ] that there is no general legal bar or policy reason limiting the availability of any police investigative techniques authorized by law in probing allegations of juvenile delinquency." J.D.H., supra, 336 N.J.Super. at 626, 765 A.2d 1084.
We reason similarly. We find nothing in the text or legislative history of the Wiretap Act that demonstrates convincingly that the Legislature intended the Act to apply only to investigations of adult suspects. As the Attorney General correctly asserts in his brief, the purpose of the Act is to accord suspects certain protections due to privacy concerns. See State v. Worthy, 141 N.J. 368, 379-80, 661 A.2d 1244 (1995) (outlining concerns implicated by Act). To address those concerns in this setting, the Legislature has mandated that law enforcement officers obtain the consent of at least one party to the conversation to be intercepted, and obtain the approval of either the Attorney General or a county prosecutor before undertaking action under the Act. Those requirements were satisfied here.
Rehabilitation of juvenile offenders is a critical goal of our juvenile justice system. In re Registrant J.G., 169 N.J. 304, 321, 777 A.2d 891 (2001). Yet, this Court also has recognized that, in view of the serious nature of juvenile crimes, "punishment has now joined rehabilitation as a component of the State's core mission with respect to juvenile offenders." Presha, supra, 163 N.J. at 314, 748 A.2d 1108. In view of that reality, we are unconvinced that the Legislature intended the Wiretap Act to constrain investigators in the manner suggested by J.D.H. We hold that the prosecutor's prior approval of the interception, together with the consent given by C.D. and her mother, satisfied the Act's requirements.

IV.
The Court expresses no opinion on the appropriateness of the trial court's ultimate disposition, including the term of commitment imposed on J.D.H. We note, however, that a considerable amount of time has elapsed since the trial court completed its adjudication and final disposition. In view of that circumstance, the trial court is directed to reexamine, after providing the State and J.D.H. an opportunity to be heard, whether the terms of its original disposition should be modified or affirmed. See J.D.H., supra, 336 N.J.Super. at 628-29, 765 A.2d 1084 (observing that had Appellate Division affirmed trial court's adjudication of delinquency, it also would have directed reconsideration of disposition given passage of time and other factors).

*857 V.
The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for reinstatement of that court's adjudication of delinquency and reexamination of its final disposition, including the term of commitment imposed on J.D.H.
For reversing and remandingChief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI7.
OpposedNone.