914 A.2d 847 (2007)
390 N.J. Super. 123
MONOGRAM CREDIT CARD BANK OF GEORGIA, Plaintiff,
v.
Robert C. TENNESEN, Defendant/Third-Party Plaintiff-Respondent,
v.
Sleepy's Inc. and 1-800 Sleepy's, Inc., Third-Party Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 2006.
Decided January 23, 2007.
*848 Donald A. Beshada, Florham Park, argued the cause for appellants (Drinker, Biddle & Reath, attorneys; Mr. Beshada, on the brief).
Michael N. Beukas, argued the cause for respondent (Fuhro, Hanley & Beukas, attorneys; Mr. Beukas, of counsel and on the brief; Matthew Coppolecchia, on the brief).
Before Judges COLLESTER, SABATINO and MESSANO.
The opinion of the court was delivered by
MESSANO, J.S.C. (temporarily assigned).
Third-party defendants, Sleepy's, Inc. and 1-800-Sleepy's, Inc. (Sleepy's), appeal the trial court's judgment of $6,000 in damages and $23,102.27 in counsel fees awarded under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20 (the CFA). Sleepy's contends there was insufficient evidence to demonstrate it withheld warranty information or otherwise committed an "unconscionable commercial practice" under the CFA and that the trial judge abused his discretion in determining the counsel fee award. We have carefully reviewed the record in light of the appropriate legal standards. We affirm.
The scope of our review of a judgment entered in a non-jury trial requires that the findings and conclusions of the trial judge not be disturbed if they are supported by substantial, credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). "Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such *849 as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999).
This suit began as a collection matter in which Monogram Credit Card Bank of Georgia (Monogram) sued defendant, Robert Tennesen, to collect the balance due on Tennesen's credit card purchase of a mattress and related items from Sleepy's. Tennesen filed a third-party action against Sleepy's alleging violations of the CFA, common law fraud, breach of the covenant of good faith and fair dealing, breach of express and implied warranties, breach of contract, breach of implied contract, and negligence.[1]
At trial, Tennesen testified to the following facts. He purchased a new Simmons Beautyrest king size mattress from Sleepy's Wayne, New Jersey store on October 13, 2003 for $1600 along with a Guardian mattress pad for an additional $45.[2] The sales invoice, however, incorrectly listed the price of the mattress and failed to include the purchase of the other items. The reverse side of the sales invoice contained a limited "warranty" from Sleepy's, but no copies of any manufacturers' warranties for the mattress or the mattress pad were provided.
Within ninety minutes of leaving the store, Tennesen phoned the Sleepy's store manager to advise him that the invoice was incorrect; the store manager acknowledged the inaccuracies and advised Tennesen that they would be corrected. Although the invoice indicated delivery would occur between 1:00 p.m. and 4:00 p.m. on October 15, the mattress was not delivered within that timeframe and Tennesen called Sleepy's customer service department to ascertain the cause of the delay. He was advised that deliveries were running late, but that the mattress would be delivered sometime later in the date. A second call from Tennesen resulted in a similar assurance.
At approximately 8:00 p.m., the delivery truck arrived at Tennesen's home. The two deliverymen, who did not identify themselves as employees of Sleepy's or some other company and wore no identifying uniforms or logos, had an extremely difficult time negotiating the stairway to the second floor of Tennesen's home. Ultimately, by bending the mattress, they were able to squeeze it under the low ceiling. When they reached the top of the stairway, they asked Tennesen for a drink of water. He obliged and, while he was downstairs getting the water, the deliverymen unwrapped the mattress from its plastic wrapper and laid it upon Tennesen's platform bed.
Tennesen inspected the exposed portions of the mattress, which was quite heavy and not designed to be flipped over or rotated during its normal usage. All appeared in order, so he signed the delivery invoice which indicated "merchandise received in good order/condition." The deliverymen gathered the plastic mattress wrapping to discard it and took it from the home when they left. They provided Tennesen with the mattress pad which was packaged in a clear cellophane wrapper, and Tennesen's wife placed the pad on the mattress disposing of the wrapper. No *850 separate manufacturer's warranty for either the mattress or the mattress pad was left with Tennesen.
In the first week of December, Mrs. Tennesen wanted to place a new bedskirt on the platform bed and asked Tennesen to lift the mattress. With assistance of two helpers, he was able to lift the mattress and discovered two large holes on the bottom of the mattress. After reviewing the warranty provisions on the back of his invoice, which indicated the holes could void its protections, Tennesen called Sleepy's customer service department, explained the problem and was assured that a replacement mattress would be delivered on an agreed date, January 7, 2004.[3]
On that date, a representative of Sleepy's came to the Tennesen home, inspected the mattress, and saw the two large holes. However, he also detected a small stain the size of an "eraser head" on the top of the mattress and advised Tennesen that he would not replace the mattress because it was stained. Tennesen then called the Guardian warranty plan but received no satisfaction. After being advised that nothing further could be done, Tennesen notified Sleepy's that he intended to contact Monogram and contest the charges for the mattress on his credit card.
After Mrs. Tennesen testified and corroborated portions of her husband's testimony, Sleepy's corporate director of customer service, Heather Cassidy, testified. Cassidy identified various corporate records which reflected that Tennesen's first contact with Sleepy's regarding the mattress problem was later than he had testified. She also testified that the written warranties for the mattress and pad were routinely included with the merchandise in the original packing for the product. She further testified that Sleepy's did not employ their own deliverymen, but, rather, contracted with outside delivery services to whom Sleepy's provided specific instructions regarding the safe handling and delivery of mattresses.
In his written opinion, the trial judge determined that the sales invoice given to Tennesen at the time of the sale was incorrect and that no "corrective" invoice was issued prior to the delivery of the mattress. He further found that the mattress was delivered by deliverymen who "did not identify themselves as employees or agents of any firm other than Sleepy's." He also concluded that "while [the mattress] was in possession of the deliverymen" its bottom was torn in two places "in the process of delivery," and that Sleepy's "agents (or contractors) likely removed the warranties [for the mattress and mattress pad] when they removed the wrapping upon leaving Mr. Tennesen's home."
Applying these facts to the CFA, the judge concluded that Sleepy's failed to accurately record the purchase price and description of the products and that it delivered "non-conforming goods" because the mattress was delivered with tears on its underside created by Sleepy's agents, the deliverymen. He further found that Tennesen notified Sleepy's of the non-conformity within a reasonable time given the size and weight of the mattress and the likelihood it would not be moved once it was placed on Tennesen's platform bed. He reasoned, "Sleepy's had an obligation to refund Mr. Tennesen the purchase price for the breach or to offer him a new mattress, [and] Sleepy's refused to do either." Lastly, citing Furst v. Einstein Moomjy Inc., 182 N.J. 1, 860 A.2d 435 *851 (2004), he concluded that the replacement cost of the mattress was $2000 which reflected Tennesen's "ascertainable loss." Pursuant to N.J.S.A. 56:8-19, he trebled those damages, entered judgment for Tennesen in the amount of $6000, and awarded the full amount of counsel fees requested, $23,102.27.[4] On June 16, 2005, the trial judge entered an order of disposition to that effect.
Sleepy's appealed. On October 31, we remanded the matter to the trial judge to "issue a written opinion or memorandum decision, finding the facts, stating the conclusions of law thereon, and providing his reasons for decision regarding the award of counsel fees" and we retained jurisdiction. On November 23, he issued his opinion on remand regarding counsel fees and once again determined Tennesen was entitled to the full amount requested.
We begin our analysis by highlighting the trial judge's findings of fact as to four critical issues. First, he found that the mattress was torn by the deliverymen and was, therefore, "non-conforming" when delivered. Second, he found that the deliverymen were Sleepy's agents and therefore their acts were attributable to Sleepy's.[5] Third, he found that Tennesen provided notice of the defect within a reasonable time given the totality of the circumstances. And, finally, he found that Sleepy's failed to refund Tennesen's money or replace the mattress. Giving deference to the trial court's ability to judge the credibility of the witnesses and assess the feel of the case, we conclude that these findings were amply supported by credible evidence in the record. See Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969) (trial judge's findings are particularly entitled to deference when they deal with issues of credibility, witness demeanor, and the "feel of the case").
Relying primarily upon DiNicola v. Watchung Furniture's Country Manor, 232 N.J.Super. 69, 556 A.2d 367 (App.Div.), certif. denied, 117 N.J. 126, 564 A.2d 854 (1989), Sleepy's argues that the trial judge's findings support a conclusion, at worst, that it breached its contract or warranty with Tennesen, but that the evidence does not support a conclusion that it violated the CFA because it did not commit an "unconscionable commercial practice." N.J.S.A. 56:8-8.
In DiNicola, plaintiff refused to accept the defendant's timely delivery of furniture because it was defective. Id. at 71, 556 A.2d 367. When the defendant failed to refund his deposit, he sued alleging a violation of N.J.A.C. 13:45A-5.1(a) and in turn, a violation of the CFA. Ibid. We concluded that a violation of the regulation, as it was then written, occurred only "when there [was] an untimely delivery of household furniture. The regulation [was] not applicable in a simple breach of warranty *852 case." Id. at 72, 556 A.2d 367. Absent a regulatory violation, we reiterated that "a breach of warranty in a sales transaction not involving an unconscionable commercial practice is not a violation of the [CFA]." Id. at 72-73, 556 A.2d 367 (citing D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J.Super. 11, 25-31, 501 A.2d 990 (App. Div.1985)). The breach could only be considered a violation of the CFA if "substantial aggravating practices" were present to transform the simple breach into an "unconscionable commercial practice." DiNicola, supra, 232 N.J.Super. at 73, 556 A.2d 367.
The regulation in question has been significantly amended since DiNicola was decided. It now reads,
§ 13:45A-5.1 Delivery practices; generally
(a) Any person who is engaged in the sale of household furniture for which contracts of sale or sale orders are used for merchandise ordered for future delivery shall:
1. Deliver all of the ordered merchandise by or on the promised delivery date; or
2. Provide written notice to the consumer of the impossibility of meeting the promised delivery date. The notice shall offer the consumer the option to cancel said order with a prompt, full refund of any payments already made or to accept delivery at a specified later time. Said written notice shall be mailed on or prior to the delivery date.
(b) In the event a seller fails to deliver all of the ordered merchandise on the promised delivery date and makes only a partial delivery, the seller shall comply with the notice requirement of (a) above. Said notice shall offer the consumer the option of cancelling the order with a prompt, full refund of any payments already made or accepting delivery of the balance of the ordered merchandise at a specified later date.
(c) Failure to comply with (a) above shall constitute a deceptive practice under the Consumer Fraud Act.
. . . .
(e) For the purposes of this section, delivery of furniture or furnishings that are damaged or that are not the exact size, style, color or condition indicated on the sales contract, shall not constitute delivery as required by (a)1 above.

1. Upon receipt of such non-conforming merchandise, the consumer shall have the option of either accepting the furniture or of exercising any of the options set forth in (a)2 above.

(Emphasis added.)
Section (e) was added pursuant to a series of amendments to the regulations made by the Division of Consumer Affairs in 2000. 32 N.J.R. 4126(a) (November 20, 2000). These regulatory changes which were in force when Tennesen purchased his mattress in October, 2003 implicate a different analysis and compel a different result from our prior decision in DiNicola.
Since the delivery of the damaged mattress was not "delivery as required by [§](a)1" of the regulation, Tennesen was entitled to exercise one of three options: accept the mattress as it was; cancel the "order with a prompt, full refund of any payments already made;" or "accept delivery at a specified later time." At trial, Sleepy's argued that Tennesen had accepted the mattress as it was, but the trial judge specifically rejected this and concluded that Tennesen notified Sleepy's of the damaged mattress "within a reasonable time" and despite its obligation "to refund [] Tennesen the purchase price . . . or to offer him a new mattress, Sleepy's refused to do either." Implicit in the trial judge's findings was a corollary *853 conclusion that the existence of the small stain on the mattress was irrelevant because the damage of the mattress during the delivery process, in the first instance, resulted in the delivery of non-conforming goods in violation of the regulation. We concur with this determination.
A violation of the CFA can arise in three different settings. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605, 691 A.2d 350 (1997). An affirmative misrepresentation, even if unaccompanied by knowledge of its falsity or an intention to deceive, is sufficient. Ibid. (citing Strawn v. Canuso, 140 N.J. 43, 60, 657 A.2d 420 (1995)). An omission or failure to disclose a material fact, if accompanied by knowledge and intent, is sufficient to violate the CFA. Ibid. (citing Cox v. Sears Roebuck & Co., 138 N.J. 2, 18, 647 A.2d 454 (1994)). Lastly, "The third category of unlawful acts consists of violations of specific regulations promulgated under the [CFA]. In those instances, intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations." Cox, supra, 138 N.J. at 18, 647 A.2d 454.
Here, pursuant to N.J.A.C. 13:45A-5.1(c), the regulatory violation was deemed to be a "deceptive practice under the [CFA]." We conclude, therefore, that the trial judge's determination that Sleepy's violated the regulation by failing to deliver conforming merchandise to Tennesen and thereafter failing to afford him the options required by the regulation was amply supported by credible evidence. The violation of the regulation "regardless of intent or moral culpability, constitutes a violation of the [CFA]." Id. at 19, 647 A.2d 454.
We next consider Sleepy's contention that the trial judge abused his discretion in awarding Tennesen $23,102.27 in counsel fees and begin by considering the principles that guide our review. An award of counsel fees by the trial court will not be overturned unless there has been a clear abuse of discretion. Rendine v. Pantzer, 141 N.J. 292, 317, 661 A.2d 1202 (1995). The starting point in awarding counsel fees is a determination of the "lodestar," or "the `number of hours reasonably expended multiplied by a reasonable hourly rate.'" Furst, supra, 182 N.J. at 21, 860 A.2d 435 (quoting Rendine, supra, 141 N.J. at 335, 661 A.2d 1202). The factors that inform the court's determination of what is a reasonable fee are those set forth in R.P.C. 1.5(a). Id. at 22, 860 A.2d 435. The court must determine both the reasonableness of the rates and the reasonableness of the time actually expended in the litigation. Id. at 22-23, 860 A.2d 435.
Once the lodestar is determined, the court may consider enhancement if the prevailing attorney entered into a contingent fee agreement. Id. at 23, 860 A.2d 435. Enhancement of the lodestar amount is also appropriate in the exceptional case where the result is "significant and of broad public interest." Rendine, supra, 141 N.J. at 341, 661 A.2d 1202. However, "a trial court should decrease the lodestar if the prevailing party achieved limited success in relation to the relief he had sought." Furst, supra, 182 N.J. at 23, 860 A.2d 435.
In his written opinion on remand, the trial judge carefully considered all these appropriate legal standards, applied them to the specific facts and circumstances of the case, and confirmed his original award of counsel fees to Tennesen. We can find no abuse of his discretion. Sleepy's arguments in this regard are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Tennesen settled his case with Monogram and the matter proceeded to trial solely on his third-party complaint against Sleepy's.
[2] Tennesen demonstrated to the salesperson that a competitor had the same mattress for $2000, and, pursuant to Sleepy's advertised sales policy in which it agreed to discount its price by twenty percent from any competitor's price, he negotiated a sales price of $1600 for the mattress.
[3] Among the warranty provisions on the back of the sales invoice is a warning, "PROTECT YOUR WARRANTYHOW TO CARE FOR YOUR MATTRESSDON'T: Bend your mattress under any circumstances."
[4] The judge found Sleepy's breached its contract, did not supply the appropriate warranties, and violated the CFA. He made no findings and reached no conclusions with respect to the other theories of recovery contained in the third-party complaint, and consequently we do not address those issues.
[5] In a footnote in its brief, Sleepy's challenges the judge's determination that the deliverymen were its agents or that it was vicariously liable for their actions. In reaching this conclusion, the judge relied upon the absence of any disclosure to Tennesen that the deliverymen were not Sleepy's employees and Sleepy's representative's own testimony that it provided detailed instructions to its deliverymen regarding the proper delivery of the mattress. We conclude the trial judge reached a reasonable determination that Sleepy's controlled the "manner and means" for doing the work and was vicariously liable for the actions of the deliverymen. Mavrikidis v. Petullo, 153 N.J. 117, 134, 707 A.2d 977 (1998).