926 A.2d 869 (2007)
394 N.J. Super. 357
Lawrence DENIKE, individually and as a member of Classic Mortgage, L.L.C., Plaintiff-Respondent/Cross-Appellant,
v.
Michael CUPO, Defendant-Appellant/Cross-Appellant/Cross-Respondent.
Lawrence Denike, individually and as a member of Classic Mortgage, L.L.C., Plaintiff-Respondent/Cross-Appellant,
v.
Michael Cupo, Defendant-Appellant/Cross-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 2007.
Decided July 6, 2007.
*873 James F. Keegan, West Orange, argued the cause for appellant/ cross-respondent (Bendit Weinstock, attorneys; Mr. Keegan, Barrett F. Kalb and Sherri Davis Fowler, on the brief).
Thomas J. Herten, Hackensack, argued the cause for respondent/ cross-appellant (Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt & Harz, attorneys; Mr. Herten and Daniel Y. Gielchinsky, on the brief).
Before Judges LEFELT, REISNER and SAPP-PETERSON.
The opinion of the court was delivered by
LEFELT, P.J.A.D.
Plaintiff Lawrence Denike and defendant Michael Cupo were the sole members of Classic Mortgage, a limited liability company, brokering residential mortgages. After some years of operation, the relationship between plaintiff and defendant soured, and plaintiff sought to buyout defendant's 50% interest in the company. After the parties could not agree on a buyout amount, litigation ensued, ending in this appeal by defendant and cross-appeal by plaintiff. Although on appeal the parties challenge the trial court's valuation of defendant's interest and its calculation of appropriate adjustments and credits, the primary issue raised involves an alleged appearance of impropriety created by the trial court's actions towards the end of the litigation. Indeed, defendant claims that this entire multi-day trial and over two years of litigation must be reversed and remanded for a new trial because, shortly before entry of the final judgment, the trial judge and plaintiff's counsel began negotiations for the judge's post-retirement association with counsel's firm, which occurred less than one month after the final judgment was entered. Because the judge had already issued a series of written opinions finally deciding the case, and signing the judgment simply memorialized those decisions, we disagree that the judge's action created an appearance of impropriety, however poorly timed it may have been. Thus we decline to order a new trial. We reject all other objections to the final judgment, except that we conclude the valuation date was incorrectly established and remand for further proceedings.

I.
We begin by summarizing the relevant facts and procedural history, which are complex due to the nature of the dispute. DeNike and Cupo formed Classic Mortgage on December 14, 1996. The operating agreement gave each member a 50% interest and provided that net profits and losses would be allocated among the members "pro rata in proportion to their respective Membership Interests." The *874 agreement also provided that when a member left the company, his capital account would be transferred to the remaining member.
At the inception of the company, plaintiff and defendant agreed to keep only 70% of their individual commissions and to leave the remaining 30% in the company's operating account for overhead expenses. The salespeople were paid commissions ranging from 30% to 55%. The net money generated by their sales went into the "corporate pot," which the members split equally at the end of the year. Thus, DeNike and Cupo received compensation through revenues generated by the company's sales force as well as their own commissions.
From the company's inception, DeNike managed the business and defendant managed the sales force including the employees' payroll. Initially they produced about the same amount of business, with plaintiff perhaps producing "marginally more." By 2000, however, because of the company's growth plaintiff was spending much more time managing the business and his sales commissions were also exceeding defendant's. This meant, in effect, that plaintiff was contributing more money towards the business expenses.
For example, in 2002, plaintiff's and defendant's 30% allocations were $1,288,650 and $829,566 respectively. Also at this time, plaintiff had been overdrawing and defendant underdrawing funds from their capital accounts. In any event, because of the extra time plaintiff was spending managing the business, defendant acquiesced in plaintiff's request for a $15,000 management fee that plaintiff began to receive monthly from July 2002 forward.
By August 2002, the relationship between plaintiff and defendant had become strained, as defendant's participation in the business declined amid rumors about his alleged drinking. Plaintiff and defendant decided to go their separate ways in September 2002, but could not agree on a buyout figure and consequently the parties continued their association.
In December 2002, plaintiff and defendant mediated their dispute with a retired Supreme Court justice. For purposes of the mediation, defendant agreed to December 31, 2002, as the date defendant's interest in the business was to be valued. During the mediation, which ended unsuccessfully in June 2003, defendant remained at Classic Mortgage and was paid for his sales at the previously agreed 70% commission rate.
Shortly after the mediation failed, plaintiff DeNike, individually and as a member of Classic Mortgage, filed a complaint and order-to-show-cause on July 2, 2003, seeking to terminate Cupo's membership in the company and acquire his interest.
On July 10, 2003, before the return date of the order-to-show-cause, defendant filed a cross-motion seeking the appointment of a special fiscal agent to oversee Classic Mortgage. On July 18, 2003, the trial court denied the cross-motion because it found no evidence of any irregularity in the management and operation of the company, and issued an order deeming Cupo dissociated from the company, subject to compensation for his membership. The judge granted limited restraints on Cupo's presence at Classic Mortgage and directed the company to make a $250,000 partial payment to him, without prejudice to a final determination of the value of his interest.
Cupo then answered the complaint, denying the key allegations, and filed a counterclaim for the fair value of his interest, an accounting, and the repayment of the "management fees" that had been paid to DeNike.
*875 On March 10, 2004, plaintiff moved to establish the valuation date for Cupo's interest as December 31, 2002, the date the parties had adopted in connection with the unsuccessful mediation. Defendant opposed the motion claiming that the appropriate date was July 18, 2003, the date the court had deemed him dissociated from the company. On April 16, 2004, the court determined that the valuation date should be December 31, 2002, which was seven months before defendant had been dissociated from the company, and simultaneously determined that Cupo was entitled to certain commissions from January 1, through July 18, 2003. An order to that effect was issued on June 15, 2004.
The trial court conducted a bench trial on this dispute during various dates from February 8 to March 10, 2005. The court heard testimony about business operations and the parties' relationship. Besides receiving testimony from DeNike, Cupo and several employees, the court also heard testimony from David Weiss, the company accountant, and two valuation experts, Karen Eisenberg and Leonard Friedman. This testimony presented various valuation approaches and differing valuations of defendant's interest in the company. As one early possibility, used as a starting point for the parties' discussions, Weiss had valued defendant's share of the business at $586,084. A second opinion was presented by Eisenberg, who testified as plaintiff's expert. She valued the business based upon its fair market value and fair value as a going concern. Using a capitalization of earnings approach, she determined that the value of the business was $944,000, and that defendant's share was therefore $472,000. After applying discounts for marketability and minority interest she reached a net value of $284,616.
Friedman testified as Cupo's valuation expert and presented a third option. He calculated the company's value using a capitalization of earnings method. Even though DeNike and Cupo were commission salespersons, Friedman assigned them salaries for purposes of his valuation. As of December 31, 2002, Friedman estimated the value of the company at $2,740,000 with $1,370,000 as defendant's interest.
On April 7, 2005, the court issued its "initial decision." In that decision, the judge found that the parties had consented to place 30% of their commissions in the business to pay overhead and continued this arrangement even after the business succeeded to the point where the employees' production covered the overhead. As the parties' production began to differ, the judge noted that their capital accounts became imbalanced. Because the parties ultimately intended to pass through to each of them whatever they brought into the business, the court determined that their accounts must be recalculated accordingly. The court further found that the parties agreed to pay plaintiff $15,000 a month for "management" from July 2002 onward.
In this initial decision, the judge also reaffirmed his prior decision that defendant had ceased his involvement with the business by the end of 2002. The court found that the parties agreed at that time that defendant would leave, that plaintiff would acquire defendant's interest and that even though defendant remained on the premises, by that time he was only a salesman. The court further noted that the parties had used the December 2002 date as the basis for their mediation and generally acted as if that was the date when defendant terminated his involvement in the company.
In the initial decision, the court also concluded that both of the experts' opinions were flawed and unreliable. After explaining why the court had rejected the valuations supplied by the experts, he *876 found that the valuation of this business was difficult to determine under the conventional methods used to value small businesses. That is so, because "[t]he departure of one producer-member does not make the company attractive to an outside investor. The person benefited is the surviving member." Thus, whatever value the business may have to a willing outside purchaser is probably less than the value of the business to the surviving member, who obtains complete control of the entity through the purchase. Accordingly, on May 13, 2005, the trial judge appointed its own expert, William Morrison, to value Classic Mortgage and calculate the parties' capital accounts.
The trial continued on December 20, 2005, at which time the court heard testimony solely from Morrison. Morrison based his opinions upon three different assumptions regarding overhead: (1) no overhead is assessed against the members' commissions, (2) actual direct expenses are allocated against the commissions, or (3) 30% overhead is assessed against the commissions. Morrison determined that plaintiff's and defendant's reconstituted capital accounts as of December 31, 2002, were $62,299 and $263,674, respectively, and that plaintiff owed defendant $100,688 for the equalizing distribution. He also determined defendant's 2003 commissions. First he found that between January 1, and July 18, defendant generated $351,925 in sales commissions of which he was owed 70% or $246,348, and received $388,559.03. Then he found defendant generated approximately $148,641 in sales commissions for transactions which closed after July 18, of which he was owed 70% or $104,048.70, and received $78,310.16. Thus, Morrison determined that defendant owed Classic Mortgage approximately $116,472.57. Morrison used that amount as a direct offset to any amount owed defendant, with consideration of the $250,000 already paid defendant.
Following cross-examination by the parties, the court asked Morrison to place a particular value on the business. After taking a brief break and making some modifications to his initial calculations, Morrison selected scenario three without discounts, explaining that the purpose of the valuation was to determine the worth of the business to plaintiff, not to an open market. He valued the gross business at $1,518,113, half of which was rounded off to $759,056. He then adjusted the amount defendant was due by subtracting $116,473 for the overpayment of commissions and $250,000 for the advance payment, and by adding a credit of $100,688 to equalize the capital accounts. Inclusive of credits and adjustments, the resulting figure was $493,271.
At the conclusion of Morrison's testimony, the court denied defendant's motion to reconsider the valuation date and reserved decision on defendant's motions for prejudgment interest from December 21, 2002 and for $98,800 in taxes plus interest. It also reserved decision on plaintiff's request to pay the judgment over five years based upon the operating agreement.
In a December 28, 2005 supplemental decision, the court accepted Morrison's calculations and opinions. The court adopted Morrison's commission/draw calculation of $116,472.57 (meaning defendant was overpaid to that extent, requiring a credit back to Classic Mortgage), reiterated the need to give credit for the $250,000 advance, and agreed that defendant's interest should not be modified by a marketability or minority discount. The court concluded that the value of defendant's interest was $750,000, after rounding off Morrison's figure. The court then adjusted defendant's account by a credit of $53,155, a debit for the overpayment of $116,473, and the payment *877 of $250,000. The court therefore ruled that plaintiff would purchase defendant's interest for $436,682.
The court denied defendant's application for prejudgment interest based on plaintiff's good-faith, substantial payment of $250,000. The court also denied defendant's counsel fee application because it found no showing that plaintiff's actions were arbitrary or vexatious, or not in good faith. Finally, the court refused to alter its earlier decision that the parties had by their actions acquiesced in the use of the December 2002 valuation date, and that defendant thereafter became "not [] an equity member, but rather [] a sales person." As a sales person, defendant was not entitled to his member's share in the profits from December 31, 2002 to his date of dissociation on July 18, 2003.
After reconsideration, the court in a second supplemental decision found that it erred by using the credit of $53,155, instead of the $100,688 actually used by Morrison to equalize the capital accounts. The court further concluded that a five-year note was an appropriate means of paying the judgment and that the obligor should be Classic Mortgage, not plaintiff.
On January 11, 2006, the judge ordered Classic Mortgage to compensate defendant pending applications relating to the specific amount and time payments of the award. On January 17, 2006, defendant challenged the court expert's valuation and adjustments and, on January 20, 2006, plaintiff sought payment of the award in installments.
In a January 20, 2006 second supplemental decision, the court adjusted its prior calculations and concluded that immediate payment contravened the parties' intent for Classic Mortgage to continue as a viable enterprise.
During this period, plaintiff's attorney in the matter, Thomas J. Herten, was aware of the trial judge's mandatory retirement date of February 24, 2006. Herten certified that he received a copy of the court's written final decision on January 23, 2006. The next day, before the final judgment memorializing that decision had been executed, Herten approached the judge about his post-retirement plans and discussions began regarding the possibility of the judge joining his firm.
On January 30, 2006, Herten received defendant's proposed form of final judgment and promissory note and submitted to the court an alternative form of judgment and promissory note. On February 1, 2006, the court entered final judgment of $493,271 against Classic Mortgage and ordered the award paid in installments. The court denied Cupo's motion seeking to have the judgment entered jointly against plaintiff and Classic Mortgage and indicated that "Classic Mortgage, LLC shall execute and deliver a promissory note, to [defendant]." (emphasis added). Significantly, the court did not select plaintiff's form promissory note over defendant's proposed note. It also denied defendant's motion seeking to have the court award him the additional amount of $98,800 on account of taxes, plus interest, which he allegedly paid. On February 1, 2006, after he had received a copy of the final judgment, Herten had another telephone conversation with the judge about his firm.
On February 3, 2006, Herten visited the judge in his chambers where they discussed the relationship, in principle, with the financial aspects to be determined later. The judge indicated that he was having a retirement dinner that evening and asked if he could announce his intention to join the Herten firm. Herten agreed that would be appropriate, and that evening the *878 judge announced that he had accepted a position as "counsel" to the Herten firm.
Ten days after the judge's announcement, defendant's counsel advised the Bergen County Assignment Judge that Cupo intended to move to vacate the final judgment and seek disqualification of the trial judge. The Assignment Judge changed the venue "in the interest of justice" and Judge Passero, of Passaic County, agreed to hear the matter.
On February 27, 2006, the original trial judge joined the Herten firm. The arrangement entitled the judge to income he generated from mediations and arbitrations, and provided that he would be responsible for some yet undefined overhead based upon those fees. Shortly thereafter, defendant moved to vacate the final judgment and all prior orders. He raised questions about the judge's failure to disclose his post-retirement negotiations and alleged that the judge's relationship with plaintiff's counsel's firm could have influenced the outcome of the case.
Before addressing defendant's motion, Judge Passero gave both parties an opportunity to file, on short notice, motions for reconsideration of any issue that could properly have been raised before the trial judge. Judge Passero specifically gave defendant the opportunity to seek reconsideration of certain components of the judgment. He also indicated that he would facilitate defendant's right to cross-examine Herten, and that both parties could question the trial judge at a subsequent hearing regarding the circumstances leading to the trial judge's association with the firm. Neither party accepted Judge Passero's offer for reconsideration or further development of the record.
Judge Passero then denied defendant's motion. He noted the lengthy complex litigation, which took two-and-a-half years to complete. He emphasized that the judge's disclosure of his post-retirement plans was "not surreptitious, this was not behind the scenes, and this was very open and clear." He also recognized the trial judge's excellent reputation for integrity and professionalism. Judge Passero emphasized that the trial judge already had made his substantive decision and that "the only thing that remained to be done was the ministerial act of formalizing in a written order that which was decided upon by [the trial judge] on January 20, 2006, and by decision prior thereto." He did recognize, however, that it would have been a better exercise of judicial discretion if the judge and Herten had immediately disclosed their initial conversations about the possibility of future employment, and also acknowledged that "maybe in retrospect and hindsight being 20/20 [the trial judge] should have done it differently."
In the order denying the motion to vacate judgment, Judge Passero again reiterated that he would entertain motions for reconsideration in the event that either party appealed the final judgment and the case was remanded for further proceedings, or in the event that an appeal was not filed. Likewise, in the event of further proceedings, he ordered that defendant would have the right to cross-examine Herten and the trial judge at a hearing before Judge Passero concerning the facts leading up to the judge's association with the Herten firm.

II.
We address first defendant's allegation of serious error caused by the judge's untimely association with the Herten law firm. It goes without saying that judges must personally observe high standards of conduct to preserve public confidence in the integrity and independence of the judiciary. In re Mathesius, 188 N.J. *879 496, 500, 910 A.2d 594 (2006); see Code of Judicial Conduct, Canon 1 (2007). A judge must avoid impropriety and the appearance of impropriety by acting at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Code of Judicial Conduct, Canon 2(a)(2007).
"The judge of any court shall be disqualified on the court's own motion and shall not sit in any matter . . . (f) when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." R. 1:12-1(f). A judge must disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned. Code of Judicial Conduct, Canon 3(c)(1)(a) (2007).
Defendant argues that the trial judge's ill-timed negotiation and announcement of his post-retirement plans created an appearance of impropriety and has undercut his "confidence in the integrity of the judicial process." See Rivers v. Cox-Rivers, 346 N.J.Super. 418, 421, 788 A.2d 320 (App.Div.2002). However, our analysis reveals that there was no actual appearance of impropriety. No person could reasonably believe that the judge had been biased, less than impartial, or unfair in conducting this trial.
In arguing for a new trial, defendant relies on the Committee on Codes of Conduct Advisory Opinion 84 (entitled Judge's Pursuit of Post-Judicial Employment), which suggests that "judge[s] should not explore [post-judicial] employment opportunities with a law firm which has appeared before the judge until the passage of a reasonable interval, so that the judge's impartiality in the handling of the case cannot be reasonably questioned."
However, the Committee on Codes of Conduct issues advisory opinions upon delegation from the Judicial Conference of the United States. In re School Asbestos Litig., 977 F.2d 764, 783 n. 24 (3d. Cir. 1992). Therefore, Advisory Opinion 84 pertains to federal judges and is not binding on State judges.
Defendant also argues that application of Pepsico, Inc. v. McMillen, 764 F.2d 458 (7th Cir.1985), would require a new trial. Pepsico recognized that the appearance of equal justice requires a judge not to explore employment prospects with lawyers representing clients in cases before him or her. Id. at 460. However, that case's holding applied only to those unusual situations "when, at the very time a case is about to go to trial before a judge, he is in negotiation  albeit preliminary, tentative, indirect, unintentional and ultimately unsuccessful  with a lawyer or law firm or party in the case over his future employment." Id. at 461.
Unlike Pepsico, in this case, the trial judge did not begin negotiations with the Herten firm until after he held a five-day bench trial and a one-day post-trial examination of the court-appointed expert, and issued three written decisions which addressed all of the substantive decisions in the case.
Defendant argues that the trial judge rejected pre-judgment interest and permitted the company to issue a promissory note after the judge began negotiations with the Herten firm. However, there is nothing in the record to suggest that after issuing his second supplemental decision, the judge revisited any of the issues on which he had already ruled.
On the final judgment itself, the judge carefully refused to endorse either form of promissory note and wrote that "[t]he interest rate was set at the judgment rate rather than at the rate in the operating agreement to recognize the effect of the *880 `advance' payment of $250,000 toward the obligation and the fact that the matter was litigated." Contrary to defendant's assertion, the handwritten note was not an "additional substantive determination[]" but simply an explanation of how the court had earlier set the interest rate.
Consequently, the only action the judge took after negotiations began with the Herten firm was the ministerial act of adopting the form order drafted by plaintiff's attorney with only a few minor editorial changes. Fazilat v. Feldstein, 180 N.J. 74, 81-82, 848 A.2d 761 (2004) (describing the insignificance of a failure to execute an order where a clear intent to do so has been shown). There is nothing in the record that causes us to doubt Herten's statement that he did not discuss any potential relationship with the judge while the case was being decided. Furthermore, Judge Passero offered defendant the opportunity to develop the record on this point, including an examination of the trial judge, but defendant demurred. Therefore, because defendant chose not to present any testimony on this point, we conclude defendant accepted Herten's account of the circumstances.
Although we agree with Judge Passero that the judge should have handled this situation differently, there are, at this time in this State, no regulatory restrictions on post-retirement employment by judges. There is currently no waiting period after retirement before employment may be accepted by a judge and no limitations on the timing of a judge's negotiations or the acceptance of post-retirement employment with any law firm. If there is to be any such regulatory restriction, it must come from the Supreme Court. In that regard, we note that the Court has recently formed an Ad Hoc Committee to review the Code of Judicial Conduct in light of the revised Model Code of Judicial Conduct adopted by the American Bar Association in February 2007. We assume that issues involving retired judges, such as the one presented here, will be considered by this new Committee.
In this appeal, we hold only that because the judge negotiated post-retirement-employment after he had rendered all substantive decisions there was no appearance of impropriety. This is so even though negotiations were begun before execution of a final judgment, as the judgment merely captured what had been earlier decided by the judge.
We recognize that defendant could have made the same appearance of impropriety argument even had the judge waited for some reasonable period after conclusion of this matter before negotiating with the firm. And while it is nevertheless our considered opinion that the judge should not have begun negotiations with the Herten firm before completely concluding this matter, and minimally should have revealed to defendant the contact that was made by plaintiff's attorney as soon as it occurred, in the absence of an appearance of impropriety or any indication of partiality, bias, or unfairness, we decline to direct a new trial. Moreover, defendant had a fair opportunity to seek reconsideration of any issue he believed the trial judge decided in error, but he declined that opportunity. Accordingly, we affirm Judge Passero's decision denying defendant's motion to vacate.

III.
In the balance of the appeal, Cupo challenges the trial court's determination of the valuation date, the fair value of his interest, the recalculation of the parties' capital accounts, the denial of a credit for taxes paid on the difference between Cupo's actual and adjusted capital accounts, the denial of prejudgment interest, *881 the failure to enter judgment individually against DeNike, the allowance of the judgment to be paid over time, the determination that the parties agreed to "true up" their 30% contributions to the business, and the finding that defendant did not understand the concept of retroactive management fees. In DeNike's cross appeal, he claims the court erred by adopting a valuation that was inconsistent with the court's opinion. Except for the date of valuation, we deny all other arguments on the appeal and cross-appeal substantially for the reasons stated by the trial court and Judge Passero. We address first the valuation date, and then briefly address the other issues raised by the parties.

A.
Defendant contends the valuation date should be July 18, 2003, the date on which the court deemed him dissociated, rather than December 31, 2002, which was the court-ordered date of valuation. Plaintiff, in opposition, argues that by the end of 2002, defendant was working sporadically, behaving peculiarly, no longer participating in management meetings, and making minimal contributions to the business. Thus, according to plaintiff, it does not matter if the court relied on N.J.S.A. 14A:12-7(8)(a), the statute cited as controlling in the pretrial order, or N.J.S.A. 42:2B-39(a), the limited liability corporation provision, which defendant argues on appeal is the controlling provision. According to plaintiff, both Titles 14A and 42 gave the court discretion to adopt the earlier date as the one on which defendant "resigned and deemed himself to be dissociated" from membership. We disagree with this argument.
A trial court's valuation date is reviewed for an abuse of discretion. Torres v. Schripps, Inc., 342 N.J.Super. 419, 437, 776 A.2d 915 (App.Div.2001); Musto v. Vidas, 333 N.J.Super. 52, 64, 754 A.2d 586 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000). However, we accord no deference to the trial court's legal conclusions. Manalapan Realty, L.P. v. Manalapan. Twp., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
The trial court explained that it set the valuation date at the end of 2002 because "the date that can be selected by the Court is that which appears to be the equitable date which can be a date as of the filing of the complaint or can be some other date." By that time, according to the court, the parties had "decided to proceed to break up, to disengage themselves, which was manifested first by the discussions and the mediation." The court further found that by the end of 2002, defendant had agreed to leave, plaintiff had agreed to acquire his interest, and defendant stayed on only as a salesman. Furthermore, the court noted that the parties had premised their mediation on the December 31, 2002 date.
Pursuant to the oppressed shareholder statute, upon the motion of the corporation or shareholder, the court may order the sale of a shareholder's stock holdings valued at "their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court." N.J.S.A. 14A:12-7(8)(a). Classic Mortgage, however, is a limited liability company governed by the New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-1 to -70 (LLCA).
The Legislature enacted the LLCA to enable members of such companies "to take advantage of both the limited liability afforded to shareholders and directors of corporations and the pass through tax advantages available to partnerships." Kuhn v. Tumminelli, 366 N.J.Super. 431, 439, 841 A.2d 496 (App. Div.) (quoting Senate Commerce Committee *882 Statement, S. Doc. No. 890, at 1 (June 14, 1993)), certif. denied, 180 N.J. 354, 851 A.2d 648 (2004). The LLCA gives members of such companies great discretion to establish structure and procedures, with the statute controlling in the absence of a contrary operating agreement. Id. at 440, 841 A.2d 496; Union County Improvement Auth. v. Artaki, LLC, 392 N.J.Super. 141, 152, 920 A.2d 125, (App.Div.2007).
The operating agreement for Classic Mortgage specified that no member had the right to voluntarily withdraw or resign. Instead, the company could dissolve followed by a winding up of its affairs. The operating agreement stated that dissolution could occur by unanimous written consent of the members, the sale or other disposition of all the company's assets, the expiration of the company's term, or "[t]he death, expulsion, bankruptcy, dissolution or incapacity of a Member or the occurrence of any event which terminates the membership of a Member. . . ." Significantly, however, the operating agreement did not specify that dissociation was an event of dissolution.
N.J.S.A. 42:2B-24 sets forth the events under which a member is dissociated from a limited liability company. Dissociation occurs on a member's resignation, bankruptcy, death, dissolution or expulsion, or on the happening of an agreed-upon event. N.J.S.A 42:2B-24a and b(1)(4). A member's expulsion occurs pursuant to the operating agreement, by unanimous vote of the other members, or by judicial determination on application by the company or another member. N.J.S.A. 42:2B-24b. Among other things, the statute provides that a court may expel a member who "engaged in conduct relating to the limited liability company business which makes it not reasonably practicable to carry on the business with the member as a member of the limited liability company." N.J.S.A. 42:2B-24b(3)(c). Here, the court deemed defendant dissociated, subject to compensation for his interest in the LLC, shortly after plaintiff filed a complaint making numerous allegations against defendant and seeking to terminate his membership.
The LLCA, however, does not specify how a valuation date is determined for purposes of purchasing a dissociated member's interest. Instead, the statutory provision entitled "Rights of dissociated member" simply provides that "the dissociated member has, subject to section 39 of P.L. 1993, c. 210 (C.42:2B-39), only the rights of an assignee of a member's limited liability interest." N.J.S.A. 42:2B-24.1 (emphasis added). N.J.S.A. 42:2B-39, which addresses a member's right to receive distribution upon resignation, states that a member is entitled to the fair value of his or her limited liability company interest as of the date of resignation.[1]
Our goal in construing any statute is to discern and implement the legislative intent. State v. Reiner, 180 N.J. 307, 311, 850 A.2d 1252 (2004). It is a fundamental tenet of statutory construction that "`every effort should be made to harmonize the law relating to the same subject matter. Statutes in pari materia are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent.'" In re Return of Weapons to J.W.D., 149 N.J. 108, 115, 693 A.2d 92 (1997) (quoting State *883 v. Green, 62 N.J. 547, 554-55, 303 A.2d 312 (1973)).
Here, both N.J.S.A. 42:2B-24 (end of membership by dissociation) and N.J.S.A. 42:2B-39 (distribution upon end of membership by resignation) deal with the change in relationships among members of a limited liability company. Either way, a member ceases to be associated with the company's business. See Carter G. Bishop, Treatment of Members Upon Their Death and Withdrawal from a Limited Liability Company: The Case for a Uniform Paradigm, 25 Stetson L.Rev. 255, 265 (1995). Moreover, either event triggers the obligation of the company to purchase the resigned or dissociated member's interest. Thus, these two statutory provisions deal with similar subject matter, seek to achieve the same purpose, and should be construed together.
Although N.J.S.A. 42:2B-24 is silent as to the valuation date for purposes of purchasing a dissociated member's interest, N.J.S.A. 42:2B-39 fixes the time as the date of resignation. It, therefore, is reasonable to conclude that the Legislature intends for a dissociated member's interest to be similarly valued as of the date of dissociation. This interpretation is consistent with the fact that the LLCA explicitly provides that a dissociated member has certain rights subject to N.J.S.A. 42:2B-39, thereby linking the two statutory provisions. N.J.S.A. 42:2B-24.1.
Under this interpretation, the LLCA does not give the court any discretion to determine the valuation date, and in that regard differs from the oppressed shareholder statute, which was evidently relied upon by the trial court. That particular statute allows the court to set the valuation date "as of the date of the commencement of the action or such earlier or later date deemed equitable by the court." N.J.S.A. 14A:12-7(8)(a). As noted above, the trial judge determined the valuation date as December 31, 2002, based on his understanding that the "statute" allowed him to select some equitable date other than the date of filing of the complaint. This was incorrect.
In our opinion, the LLCA requires the same valuation date for dissociations as for resignations. Therefore, because the judge deemed Cupo dissociated as of July 18, 2003, he became entitled, as of that date, to a distribution of "the fair value of his limited liability company interest." N.J.S.A. 42:2B-39.
In addition, we reject plaintiff's argument that the trial court correctly relied upon the mediation agreement to establish December 2002 as the valuation date. The mediation letter specifically stated that defendant agreed to a valuation date of December 31, 2002, and acknowledged plaintiff's request that the date be used without prejudice. According to defendant's testimony, plaintiff wanted to reserve the right to argue for the earlier date of September 30, 2002, in the event mediation proved unsuccessful. Thus, the parties did not agree to utilize this valuation date beyond any failed mediation.
We will not accept a valuation date agreed to in the mediation for the sole purpose of mediation without a clear agreement by the parties that the date would remain viable should mediation fail. A contrary rule has the potential of deterring a party's willingness to mediate. This, we decline to do.

B.
Defendant Cupo also argues that the court erred in determining his fair share. Specifically, Cupo asserts that the court applied incorrect legal principles, imposed conditions on its expert which impaired Morrison's ability to render an opinion, *884 improperly relied upon Morrison's "off-the-cuff" valuation, and relied upon Morrison's flawed valuation.
In a bench trial, the acceptance or rejection of an expert's opinion as to valuation of a corporation, and the expert's methodology, are matters peculiarly within the province of the trial court. The judge's findings are thus entitled to great deference and will be reversed only if the trial judge abused his discretion. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 368, 734 A.2d 721 (1999). However, the question of what standards of value are permissible to consider is one of law and, thus, is subject to de novo review. Casey v. Brennan, 344 N.J.Super. 83, 113, 780 A.2d 553 (App.Div.2001), aff'd, 173 N.J. 177, 801 A.2d 245 (2002).
The LLCA utilizes the phrase "fair value of his limited liability company interest" to designate what a resigning member is entitled to receive. N.J.S.A. 42:2B-39(a). Fair value is not synonymous with fair market value. Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 397, 734 A.2d 738 (1999). There is no inflexible test to determine fair value. Steneken v. Steneken, 183 N.J. 290, 297, 873 A.2d 501 (2005). We generally consider "`. . . proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.'" Id. at 297, 873 A.2d 501.
Morrison recognized that the interest being sold was not listed on any stock market and, thus, was not readily marketable. He also recognized that a sale of Cupo's interest to a third-party would not give the purchaser a controlling stake in the company. The situation was unique and the traditional "fair market value," which assumes a willing buyer and willing seller, did not apply. That was so because defendant's interest had little value to outsiders, but significant intrinsic value to plaintiff, who wanted to continue the business. See Brown v. Brown, 348 N.J.Super. 466, 487-88, 792 A.2d 463 (App. Div.), certif. denied, 174 N.J. 193, 803 A.2d 1164 (2002). We have no doubt that Morrison applied the proper valuation method.
There is no dispute that Morrison would have done things differently if he had conducted his own investigation and not been restricted by the trial court. However, there is no indication that the opinion rendered by Morrison based on the court's restrictions was contrary to accepted valuation principles. For example, Morrison's valuation of the interest without applying marketability and minority discounts was consistent with the general rule that marketability and minority discounts are not applied in valuation proceedings where there will be no actual transfer of shares and a sale of the entire business appears unlikely. See Brown, supra, 348 N.J.Super. at 489, 792 A.2d 463. In any event, the judge's findings based upon Morrison's testimony were not "so wholly unsupportable as to result in a denial of justice." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).
Although defendant complains about Morrison's "off-the-cuff" valuation, the expert explained what he had done and did not appear to have been forced into making an arbitrary decision. As he explained, the gross valuation of the business was $1,518,113 and defendant's share was $759,056, which was his "best call on effectuating [the court's] decision based upon everything [he had] seen . . . [and] it appears fair and reasonable." Furthermore, Morrison's observations and conclusions were fully explored on cross-examination. We cannot find that the trial court abused its discretion by pressing Morrison to value *885 defendant's share from the witness stand.
Finally, we reject defendant's argument that Morrison's valuation was flawed. Specifically, defendant argues that Morrison arbitrarily reduced the excess assets by 25% and that the court, in turn, arbitrarily rounded Morrison's estimate of defendant's 50% interest to $750,000. Morrison, however, explained that he reduced the excess assets because he found the parties' experts' recommendations to be "too aggressive," an explanation which the court found credible and had discretion to accept. The court also had discretion to round-off the final figure, given that valuation is not an exact science. See Steneken, supra, 183 N.J. at 297, 873 A.2d 501.

C.
Defendant also contends the court erred by finding that the parties' capital accounts had to be "equalized" based upon an alleged agreement to "true up" their 30% contributions to the business. Defendant argues the parties never agreed to "go back" and "true up" their contributions, but simply intended to stop making them when the business generated enough income to cover expenses.
However, the trial court concluded from the testimony that the parties' intent was ultimately to pass through to each of them whatever was brought into the business. The court explained that the 30% was only "deferred" to the account until such time as the company was financially successful, meaning when the revenue generated by its salespeople (less their salaries or commissions) would pay the overhead. At that time, the full amount of their commission would pass directly to the members.
Although there were no earlier discussion on what would happen if there was an imbalance in the members' capital accounts, in September 2002, Weiss suggested that they could reconcile (or "even-up") the accounts by allowing plaintiff to take out his 30% by way of "retroactive management fees." Cupo claims never to have agreed to any retroactive management fee and to have been shocked by the calculation. Based upon this testimony, however, the court ordered the accounts recalculated or evened out, which was, in our view, only equitable.
In any event, we must give deference to the trial court's ability to judge the credibility of the witnesses and assess the feel of the case. Monogram Credit Card Bank of Ga. v. Tennesen, 390 N.J.Super. 123, 130-31, 914 A.2d 847 (App.Div.2007). Here, the trial court reviewed the conflicting testimony on the treatment of the 30% contributions, and reached its decision on the basis of findings of fact that are supported by credible evidence in the record. Ibid. Consequently, the findings are binding on us.

D.
Defendant also argues that the trial court erred by failing to credit him for $98,530 in taxes paid on income which he did not receive from Classic Mortgage. Specifically, defendant claims he paid taxes on the difference between his reported capital account of $510,407 and the reconstituted capital account of $263,674. The tax was on money defendant never received because that year plaintiff withdrew $700,000 more than he was allocated.
Unfortunately, the trial court did not explain its reasons for denying the motion to award defendant an additional amount for taxes allegedly paid. Although Morrison testified that a credit might be appropriate, he valued defendant's interest as of December 31, 2002. As we have explained, defendant's interest must be valued as of July 18, 2003. Assuming the *886 validity of defendant's contention that he paid taxes on amounts that plaintiff overdrew in 2002, the record also shows plaintiff similarly paid taxes on money which defendant overdrew in 2003, which Morrison calculated as $116,472.47. Thus, the trial court correctly rejected this argument.

E.
Defendant also seeks prejudgment interest on appeal. The purpose of prejudgment interest is compensatory to indemnify claimants for the loss of what they could have earned on the amounts ultimately awarded if they had received them when due. Rova Farms Resort, Inc., supra, 65 N.J. at 506, 323 A.2d 495; Busik v. Levine, 63 N.J. 351, 358, 307 A.2d 571, appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).
In our view, the court acted well within its discretion when it implicitly found that there was no manifest injustice in denying prejudgment interest on the money owed defendant after deduction of the advance payment. The $250,000 payment to defendant ultimately represented over half of the total amount of $493,271 awarded to him, whether the payment was voluntary or required by the court's order. See Sulcov v. 2100 Linwood Owners, Inc., 303 N.J.Super. 13, 39 696 A.2d 31 (App.Div.1997), appeal dismissed, 162 N.J. 194, 743 A.2d 847 (1999). Consequently, we reject this claim also.

F.
Defendant further contends that the court erred by failing to enter final judgment against plaintiff, and in allowing the judgment to be paid over time. The court explained that the parties' agreement "manifested" an intent to allow the company to "continue as, a viable enterprise. The provision for a 5-year note permits just that." The court also believed that the obligation was "that of the company, not of the remaining member, notwithstanding that he now becomes the only member of the LLC."
Plaintiff filed the complaint individually and on behalf of Classic Mortgage. The operating agreement provided at Section 20.1.4 that a distribution was to be made when a member's membership was terminated. Section 20.1.4.3 specifically provided for a payment "[a]t the company's option, . . . in a lump sum or by promissory note payable in equal quarterly installments over a period of five (5) years." The trial court's order thus enforces this agreement.
We may not rewrite a contract or grant a better deal than that for which the party expressly bargained. Solondz v. Kornmehl, 317 N.J.Super. 16, 21, 721 A.2d 16 (App.Div.1998) (citing Hartford Fire Ins. Co. v. Riefolo Constr. Co., 161 N.J.Super. 99, 114, 390 A.2d 1210 (App.Div.1978), aff'd, 81 N.J. 514, 410 A.2d 658 (1980)). "We must enforce the contract which the parties themselves have made." Id. at 22, 410 A.2d 658 (citing Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43, 161 A.2d 717 (1960)).

G.
Finally, defendant argues that several of the court's findings were not supported by substantial credible evidence in the record. Defendant claims there was insufficient support for the court's finding of a "true up" agreement for the 30% contribution and that defendant did not initially understand the concept of retroactive management fees. Our review of the record reveals sufficient support for the court's finding concerning the "true up" agreement. Although the court did not explain why it made the latter finding, defendant *887 fails to show how such a statement was clearly capable of producing an unjust result and thus, does not warrant a remand. R. 2:10-2.

H.
On plaintiff's cross-appeal, he contends that Morrison did not render an opinion that was consistent with the proceedings. He essentially argues that the court erred when it adopted Morrison's scenario three without discounts. Instead, plaintiff argues that scenario two without discounts, but with the reduction for excess assets and the modified capitalization rate, was most consistent with the court's decision. Plaintiff requests that we exercise our original jurisdiction to perform "simple mathematical equations" to find that the total due defendant is $196,215. We decline plaintiff's request.
Morrison explained why scenario three was most appropriate and was cross-examined by the court and both counsel. The court's acceptance of this scenario was not an abuse of its discretion and thus there is no need to make any recalculations. Furthermore, an exercise of original jurisdiction is inappropriate in cases dependent upon credibility assessments. See State ex rel. J.D.H., 336 N.J.Super. 614, 628, 765 A.2d 1084 (App.Div.2001), rev'd on other grounds, 171 N.J. 475, 795 A.2d 851 (2002).

III.
Accordingly, for the reasons explained above, we affirm Judge Passero's order denying the motion to vacate and reject all other arguments by both parties, except for the valuation date and a minor mistake in the judgment. Accordingly, we reverse and remand in part: (1) for a calculation by the court's expert of the amount owed defendant for his membership interest in Classic Mortgage from January 1 through July 18, 2003, using Morrison's valuation methodology; and (2) for a recalculation of the final judgment based upon the figure of $750,000, instead of the non-rounded figure of $759,056, which was used in the final judgment. As Judge Passero correctly noted, the final judgment under review mistakenly included the non-rounded off figure.
Affirmed in part, reversed in part, and remanded in part.
NOTES
[1] Section 701(a)(1) of the Uniform Limited Liability Company Act (1996) provides that a member is entitled to the fair value of his or her interest as of the date of the member's dissociation. However, New Jersey chose not to incorporate that language into its version of the law. Our research has failed to locate any legislative history explaining the omission.